802 So.2d 1121 (2001)
James D. FORD, Appellant,
v.
STATE of Florida, Appellee.
No. SC95972.
Supreme Court of Florida.
September 13, 2001.
Rehearing Denied December 13, 2001.
*1125 James Marion Moorman, Public Defender, and Robert F. Moeller, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, FL, for Appellee.
SHAW, J.
James D. Ford was convicted of sexual battery with a firearm, child abuse, and two counts of first-degree murder. He was sentenced to 19.79 years' imprisonment, five years' imprisonment, and death, respectively. He appeals his convictions and sentences. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm.

I. FACTS
James ("Jimbo") Dennis Ford and Greg Malnory were co-workers at the South Florida Sod Farm in Charlotte County. On Sunday morning, April 6, 1997, Ford made plans to go fishing later that day with Greg and his wife Kim on the sod farm. The relevant facts are set forth in the trial court's sentencing order:
In the early afternoon of April 7, 1997, an employee of the South Florida Sod Farm made a gruesome discovery on the grounds of the 7,000 acre farm located in a remote area of Charlotte County. At the scene of these crimes, authorities found the pickup truck owned by Greg and Kim Malnory in the middle of a field. Some distance away, they found the body of Greg Malnory. He had been shot in the head from behind by what was later determined to be a .22 caliber rifle.
The shooting evidently occurred somewhere in the vicinity of the crime scene, perhaps between the Malnorys' truck and a nearby pond. Greg then apparently staggered out into the middle of the field, followed by the Defendant.
The Defendant then inflicted at least seven blunt force injuries to the head and face of Greg Malnory with what has been described by the medical examiner as a blunt instrument consistent with an axe. Greg was found lying on his back in the middle of the field with his throat slit nearly from ear to ear, so deeply that underlying muscle tissue was exposed. The massive amount of blood found on Greg Malnory's chest and shirt lead [sic] to the inescapable conclusion that Greg was first shot in the head, that the bullet only disabled him, and that the Defendant then savagely killed him by beating him to death and slitting his throat while Greg was lying on his back in the middle of the field.
The body of Kimberly Malnory was found near the truck. Evidence revealed the existence of nine blunt force injuries to her head, one of which fractured and penetrated her skull. Defensive wounds were found on the backs of Kim's arms indicating that she put up a struggle. There was also evidence of two oval discolorations on the superficial tissues on the inside of Kimberly Malnory's thighs which were suggestive of thumb prints. These marks were made by the Defendant while Kimberly Malnory was alive.
DNA testing revealed the presence of the Defendant's semen inside Kimberly Malnory and on her shirt. The single piece bathing suit that Kimberly Malnory was wearing under her shirt at the time of the killings had been sliced clean through the crotch as if with a sharp knife. Before raping *1126 Kimberly Malnory, the Defendant took the weapon he had used to shoot Gregory Malnory, a .22 caliber singleshot, bolt-action rifle named "old Betsy," and reloaded it with another bullet. A cast of Kimberly Malnory's pallet [sic] revealed that the Defendant then stuck the end of the barrel of the rifle inside Kimberly Malnory's mouth and pulled the trigger.
Authorities also discovered the Malnorys' 22 month old baby girl, Maranda, in the car seat inside the Malnorys' truck. The baby had been strapped inside the vehicle for well over 18 hours with the doors wide open, exposed to the elements overnight and for much of the next day. Little Maranda was found with mosquito bites over most of her body and her mother's blood over both the front and back of her clothes and on her shoe....
Although the evidence is in some dispute as to the exact series of events which occurred at the sod farm on the afternoon of April 6, 1997, it is not necessary for the Court to determine the precise sequence by which these horrible crimes were committed ....
Suffice it to say that the Court is convinced that Gregory Malnory was initially shot in the head by the Defendant at an angle slightly from behind. The Defendant may have then hit Kimberly Malnory in order to disable her. At some point the Defendant realized that Greg was not yet dead, and then the Defendant followed him out into the middle of the field where he bludgeoned him and slit his throat.
While the Defendant was completing the killing of Gregory Malnory, Kimberly Malnory did what she could to save Maranda. This explains the presence of her blood on the baby. Upon his return to the pickup truck, the Defendant then raped Kimberly Malnory, brutally beat her and executed her with his rifle.
Evidence of guilt presented by the State showed the following: Ford was seen with the victims in the area of the crime just prior to the killings; Ford was seen that evening in a distracted state with blood on his face, hands, and clothes; he was observed the next day, Monday, with scratches on his body; the rifle stock of a .22 caliber single-shot Remington rifle that belonged to Ford was found in a drainage ditch in the area where Ford's truck ran out of gas Sunday evening; DNA from human debris found inside an Old Timer's folding knife recovered from Ford's bedroom matched Greg Malnory's DNA type; DNA from a stain on a shoe in Ford's truck matched Kim Malnory's type; DNA from a stain on the seat cover in Ford's truck matched Kim's type; DNA from semen found on the shirt Kim was wearing when murdered matched Ford's type; DNA from vaginal swabs taken from Kim matched Ford's type.
Ford was convicted of sexual battery with a firearm, child abuse, and two counts of first-degree murder. During the penalty phase of the trial, Ford presented more than two dozen witnesses, including two mental health professionals and several family members and friends. The State presented evidence in rebuttal. The jury recommended death on each murder count by an eleven-to-one vote, and the court imposed a sentence of death on each count based on four aggravating circumstances,[1] *1127 several statutory mitigating circumstances,[2] and several nonstatutory mitigating circumstances.[3] The court imposed a sentence of 19.79 years' imprisonment (with a three-year mandatory minimum term) on the sexual battery with a firearm count and a concurrent five-year sentence on the felony child abuse count. Ford raises six issues on appeal.[4]

II. GUILT PHASE

A. Prosecutorial Comments

Ford claims that the trial court erred in not granting a mistrial based on prosecutorial comments at four points in closing argument during the guilt phase. Ford claims that the court should have granted defense counsel's motion for a mistrial at the following points: (1) when Ford challenged the propriety of the prosecutor's football analogy that "the best defense is a good offense";[5] (2) when *1128 Ford challenged the propriety of the prosecutor's statement that defense counsel (as well as the prosecutor) got the numbers confused when handling evidence at trial;[6] (3) when Ford challenged the prosecutor's statement wherein the prosecutor invited jurors to consider the prospect of defense counsel questioning Alexander Graham Bell concerning the workings of the telephone;[7] and (4) when Ford challenged the prosecutor's statement that defense counsel mixed up the numbers of a State exhibit.[8] We disagree.
*1129 Both the prosecutor and defense counsel are granted wide latitude in closing argument.[9] A mistrial is appropriate only where a statement is so prejudicial that it vitiates the entire trial.[10] A trial court's ruling on a motion for a mistrial is within the sound discretion of the court and will be sustained on review absent an abuse of discretion.[11] In the present case, the trial court responded to defense counsel's objections by ruling in favor of the defense on each point: (1) The court sustained the objection and gave a cautionary instruction to the prosecutor; (2) the court sustained the objection; (3) the court sustained the objection; and (4) the court sustained the objection and gave a curative instruction to the jury. In light of the trial court's response, the prosecutor's statements either individually or cumulatively do not appear to be so prejudicial that no reasonable person would have allowed the trial to continue. We find no abuse of discretion.

B. Use of the Term "Flesh"

During direct examination of Dr. Martin Tracy, who was the State's expert on DNA statistics, the prosecutor asked Tracy a question concerning the "flesh" found inside Ford's folding knife.[12] Defense counsel objected to use of the word "flesh" and requested a mistrial. Ford claims that the court erred in failing to grant a mistrial. We disagree.
As noted above, a mistrial is appropriate only where a statement is so prejudicial as to vitiate the entire trial.[13] A trial court's *1130 ruling on a motion for a mistrial is within the sound discretion of the court and will be sustained on review absent an abuse of discretion.[14] In the present case, the trial court sustained the objection, denied defense counsel's motion for a mistrial, and gave a curative instruction as requested by defense counsel. The prosecutor's comment, when viewed in the context in which it was made, appears to be inadvertent and, in light of the court's corrective action, does not appear to be so prejudicial that no reasonable person would have allowed the trial to continue. We find no abuse of discretion.

C. The Child Abuse Charge

The indictment charged Ford with child abuse, among other offenses. After the State rested its case in the guilt phase, Ford filed a motion for judgment of acquittal and challenged both the propriety of the indictment vis-a-vis the child abuse charge and the sufficiency of the evidence to support a conviction for child abuse. The trial court denied the motion and Ford claims this was error. We disagree.
Where a defendant waits until after the State rests its case to challenge the propriety of an indictment, the defendant is required to show not that the indictment is technically defective but that it is so fundamentally defective that it cannot support a judgment of conviction.[15] In the present case, the caption of the indictment charged Ford with violating section 827.03, Florida Statutes (Supp.1996), and the text of the indictment stated specific grounds.[16] Although section 827.03 embraces three separate child abuse-related offenses (i.e., simple child abuse, aggravated child abuse, and neglect of a child) and the grounds set forth in the indictment could have supported charges of either simple child abuse under section 827.03(1) or neglect of a child under section 827.03(3), this is not a sufficient basis for invalidating the conviction at this point. Any inquiry concerning the technical propriety of the indictment should have been raised prior to trial at which time any deficiency could have been cured. The indictment as worded adequately placed Ford on notice that he was charged with a violation of the child abuse proscriptions of section 827.03.
*1131 Evidence adduced at trial showed that Ford murdered both Maranda's parents and then left the twenty-two month old child strapped in her car seat in an open pickup truck in an isolated wooded area of the sod farm. When she was found the next day, she was dehydrated, flushed with heat, and covered with insect bites. This is a sufficient evidentiary basis to support a third-degree felony child abuse conviction under section 827.03.

III. PENALTY PHASE

A. Prosecutorial Comments

Ford claims that he was denied a fair sentencing proceeding based on prosecutorial comments at four points during closing argument in the penalty phase: (1) Ford claims that the prosecutor improperly stated the law when he said that the punishment must fit the crime;[17] (2) Ford claims that the prosecutor turned mitigators into aggravators when he said that Ford had no excuse for committing the crime and that, in a way, the fact that he had not been abused during his childhood makes this crime worse;[18] (3) Ford claims that the prosecutor improperly referred to "sympathy";[19] and (4) Ford claims that the prosecutor improperly commented on lack of remorse.[20] We disagree.
*1132 As noted previously, attorneys are granted wide latitude in closing argument.[21] It is within the court's discretion to control the comments made to a jury, and a court's ruling will be sustained on review absent an abuse of discretion.[22] In the present case, the trial court responded to defense counsel's objections as follows: (1) The court overruled defense counsel's objection; (2) pursuant to defense counsel's request, the court instructed the prosecutor to avoid using the term "excuse"; (3) the court overruled defense counsel's objection; (4) pursuant to defense counsel's request, the court instructed the jury to disregard the comment by the prosecutor and the court told the jury that closing arguments were merely the personal opinions of counsel and jurors were to rely only on the evidence.
The trial court's response on these points was appropriate. (1) The prosecutor's statement that the "punishment must fit the crime," when viewed in the totality of the closing argument, was a simple and fair representation of the law. Ford's claim that this statement barred the jury from considering the character and history of the defendant is incorrect; the prosecutor said nothing about excluding those factors. (2) As for the prosecutor's statement that Ford had no excuse for committing the crime, the judge instructed the prosecutor to refrain from pursuing that tack. As for the statement that Ford's lack of abuse makes the crime worse, the Court already has decided this claim adversely to the defendant.[23] (3) As for Ford's "sympathy" argument, the Court already has decided this claim adversely to the defendant.[24] (4) As for Ford's "remorse" argument, the Court already has decided this claim adversely to the defendant.[25] We find no abuse of discretion.

*1133 B. CCP

The trial court instructed the jury on CCP and found that CCP was established. Ford claims that the court erred on both points. We disagree. A trial court may give a requested jury instruction on an aggravating circumstance if the evidence adduced at trial is legally sufficient to support a finding of that aggravating circumstance.[26] A trial court's ruling on an aggravating circumstance is a mixed question of law and fact and will be sustained on review as long as the court applied the right rule of law and its ruling is supported by competent substantial evidence in the record.[27]
In the present case, the trial court gave the standard jury instruction on CCP and the record contains the following evidentiary support for that aggravator: After learning that the Malnorys were planning to go fishing at the sod farm Sunday afternoon, Ford injected himself into their outing; at the sod farm, he led them to a secluded spot near the levee where they were unlikely to be disturbed or seen; prior to going to the sod farm, he asked a friend if he had any .22 caliber cartridges, and when the friend replied that he did not, Ford said that he had four cartridges left and that would be enough (the victims were each killed with a single shot from a.22 caliber gun); he shot the Malnorys with a single-shot rifle, which means he had to stop and reload after the first shot; he shot the victims "execution-style," i.e., he shot Greg in the back of the head and Kim through the roof of her mouth; based on the placement of the shots, it can be deduced that neither victim was threatening Ford at the time he or she was shot; during the course of the murders, Ford assaulted the Malnorys with three different weapons, i.e., a gun, a blunt instrument such as an ax, and a knife; and finally the crime scene is devoid of evidence of a frenzied attack. Based on the foregoing, the trial court did not err in giving the CCP instruction and in finding CCP as an aggravator.

IV. MITIGATION
As noted above, the trial court in its sentencing order addressed a number of statutory and nonstatutory mitigating circumstances. Ford now claims that the court failed to properly consider all the mitigating evidence.

A. The Applicable Law

This Court in Campbell v. State, 571 So.2d 415 (Fla.1990), set forth the abiding standard for evaluating mitigating circumstances:
When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature. The court must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence: "A mitigating circumstance need not be proved beyond a reasonable *1134 doubt by the defendant. If you are reasonably convinced that a mitigating circumstance exists, you may consider it as established." The court next must weigh the aggravating circumstances against the mitigating and, in order to facilitate appellate review, must expressly consider in its written order each established mitigating circumstance. Although the relative weight given each mitigating factor is within the province of the sentencing court, a mitigating factor once found cannot be dismissed as having no weight. To be sustained, the trial court's final decision in the weighing process must be supported by "sufficient competent evidence in the record."
Campbell, 571 So.2d at 419-20 (footnotes and citations omitted).
The Court recently in Trease v. State, 768 So.2d 1050 (Fla.2000), modified the Campbell standard in one respect:
We hereby recede from our opinion in Campbell to the extent it disallows trial courts from according no weight to a mitigating factor and recognize that there are circumstances where a mitigating circumstance may be found to be supported by the record, but given no weight. The United States Supreme Court has held that a sentencing jury or judge may not preclude from consideration any evidence regarding a mitigating circumstance that is proffered by a defendant in order to receive a sentence of less than death. Nevertheless, these cases do not preclude the sentencer from according the mitigating factor no weight. We therefore recognize that while a proffered mitigating factor may be technically relevant and must be considered by the sentencer because it is generally recognized as a mitigating circumstance, the sentencer may determine in the particular case at hand that it is entitled to no weight for additional reasons or circumstances unique to that case. For example, while being a drug addict may be considered a mitigating circumstance, that the defendant was a drug addict twenty years before the crime for which he or she was convicted may be sufficient reason to entitle the factor to no weight.
Trease, 768 So.2d at 1055 (citations omitted). The Campbell standard thus remains the authoritative criterion in this area, as modified by Trease.
To summarize, when a court is confronted with a factor that is proposed as a mitigating circumstance, the court first must determine whether the factor is mitigating in nature. A factor is mitigating in nature if it falls within a statutory category[28] or otherwise meets the definition of a mitigating circumstance.[29] The *1135 court next must determine whether the factor is mitigating under the facts in the case at hand.[30] If a proposed factor falls within a statutory category, it necessarily is mitigating in any case in which it is present.[31] If a factor does not fall within a statutory category but nevertheless meets the definition of mitigating circumstance, it must be shown to be mitigating in each case, not merely present.[32] If a proposed factor is mitigating under the facts in the case at hand, it must be accorded some weight;[33] the amount of weight is within the trial court's discretion.[34]
The standards of review governing mitigating circumstances are wellsettled:
The Court in Campbell v. State, 571 So.2d 415 (Fla.1990), established relevant standards of review for mitigating circumstances: 1) Whether a particular circumstance is truly mitigating in nature is a question of law and subject to de novo review by this Court; 2) whether a mitigating circumstance has been established by the evidence in a given case is a question of fact and subject to the competent substantial evidence standard; and finally, 3) the weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard.
Blanco v. State, 706 So.2d 7, 10 (Fla.1997) (footnotes omitted).

B. The Present Case

In the present case, after the defense experts presented proof that Ford (who was thirty-eight at the time of sentencing) is a slow learner and has limited capabilities, the trial court held that the following proposed nonstatutory factors were "proven" (i.e., the court held that the following proposed factors are mitigating in nature and are present in the instant case): (a) The defendant is learning disabled; and (b) the defendant has a developmental age of fourteen. However, based on extensive testimony by other witnesses showing that Ford functions well as a mature adult, the court concluded that these factors are not mitigating under the facts in the case at hand and accorded them no weight. Our review of the record shows that this ruling is supported by competent substantial evidence. We find no error.
The trial court held that the following proposed nonstatutory factors are present in the instant case but are not mitigating in nature: (a) a family history of alcoholism; (b) a medical history of diabetes; (c) the lack of sociopathic or *1136 psychopathic tendencies; and (d) the absence of antisocial tendencies. We disagree. Each of these factors is mitigating in nature in that each relates to a defendant's character or record or the circumstances of the offense and reasonably may serve as a basis for imposing a sentence less than death. While these factors are mitigating in nature, they may or may not be mitigating under the facts in the case at hand (that is for the trial court to determine). In the instant case, we need not reach this issue, for we find any error harmless in light of the following: (a) These factors occupy a minor and tangential position in the present record; (b) the present case contains vast aggravation, including multiple execution-style murders; and (c) the trial court recognized and gave weight to numerous other mitigators.[35]
The court ruled that another proposed nonstatutory factor, i.e., the alternative punishment to death is life imprisonment without parole, is not mitigating in nature and gave it no weight. We disagree. Parole ineligibility is mitigating in nature because it relates to the circumstances of the offense and reasonably may serve as a basis for imposing a sentence less than death.[36] While this factor is mitigating in nature, it may or may not be mitigating under the facts in the case at hand (that is for the trial court to determine).[37] In the instant case, we need not reach this issue, for we find any error harmless for reasons stated above.[38]

V. CONCLUSION
Based on the foregoing, we conclude the following: Ford received a fair trial; his convictions and sentences are adequately supported in the record; and his sentences are proportionate. We affirm the convictions and sentences.
It is so ordered.
WELLS, C.J., and HARDING and LEWIS, JJ., concur.
PARIENTE, J., concurs in result only with an opinion, in which ANSTEAD, J., concurs.
QUINCE, J., concurs as to conviction and concurs in result only as to sentence.
PARIENTE, J., concurring in result only.
I concur in the majority's affirmance of Ford's convictions on all counts and Ford's sentences for sexual battery with a firearm and child abuse. However, I concur in the result only as to Ford's death sentences because I am concerned that the majority's explanation of our holdings in Campbell v. State, 571 So.2d 415 (Fla.1990), and Trease v. State, 768 So.2d 1050 (Fla.2000), may unintentionally lead to trial judges rejecting mitigating evidence established by a preponderance of the evidence by assigning it no weight and thus result in disparity in the way trial judges evaluate mitigating *1137 circumstances.[39] For this reason, I now question the wisdom of our having receded from the clear dictates of Campbell as to how to evaluate mitigating evidence.
If the intent in today's decision is to clarify Trease, it must be made clear that we are in no way receding from our prior case law that states that mitigating factors, "include all matters relevant to the defendant's character or record or to the circumstances of the offense proffered as a basis for a sentence less than death." Spencer v. State, 691 So.2d 1062, 1064 (Fla.1997). Indeed, United States Supreme Court precedent mandates nothing less.
As the United States Supreme Court explained in Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Eighth and Fourteenth Amendments require that trial courts consider "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Second emphasis supplied.) The Court stated further that if a court in a capital case fails to weigh "aspects of the defendant's character and record and ... circumstances of the offense proffered in mitigation," there is a "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." Id. at 605, 98 S.Ct. 2954. Accordingly, the Court struck down the Ohio death penalty statute because it failed to allow trial courts to consider certain mitigating evidence. See id. at 604, 98 S.Ct. 2954.
In Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court reiterated its holding in Lockett that in order to ensure that capital punishment is "imposed fairly, and with reasonable consistency, or not at all," sentencing courts must consider any relevant mitigating factor, including "the circumstances of the offense together with the *1138 character and propensities of the offender." (Emphasis supplied.) Addressing whether the state trial court erred in refusing to consider proposed mitigating evidence, the Supreme Court held that the trial court may not "refuse to consider, as a matter of law, any relevant mitigating evidence.... The sentencer ... may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration." Id. at 114-15, 102 S.Ct. 869.
In Eddings, the United States Supreme Court overturned a defendant's death sentence because the trial court refused to consider in mitigation circumstances involving the fact that the defendant was abused as a child. 455 U.S. at 113, 102 S.Ct. 869. The Supreme Court concluded that both the trial court and the appellate court refused to weigh this mitigating evidence because they "found that the evidence in mitigation was not relevant because it did not tend to provide a legal excuse from criminal responsibility." Id. Thus, the Court held that both the trial court and the appellate court erred in failing to consider this evidence in mitigation, stating "there can be no doubt that evidence of a turbulent family history, of beatings by a harsh father" is particularly relevant even though this evidence did "not suggest an absence of responsibility for the crime of murder, deliberately committed in this case." Id. at 115-16, 102 S.Ct. 869.
In Campbell, 571 So.2d at 419, we attempted to interpret the Supreme Court's decision in Eddings and provided guidelines for trial courts to follow in evaluating mitigating evidence because we recognized that "our state courts continue to experience difficulty in uniformly addressing mitigating circumstances." Thus, we explained:
When addressing mitigating circumstances, the sentencing court must expressly evaluate in its written order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature. The court must find as a mitigating circumstance each proposed factor that is mitigating in nature....
Id. (citations and footnotes omitted). We adopted the Lockett definition of a mitigating circumstance: "any aspect of a defendant's character or record and any of the circumstances of the offense" that reasonably may serve as a basis for imposing a sentence less than death. Campbell, 571 So.2d at 419 n. 4.
Based on Campbell, we required that trial courts: (1) determine whether the defendant's proposed evidence qualifies as a mitigating circumstance; (2) determine whether the proposed mitigating factor has been established by the preponderance of the evidence; (3) weigh the established mitigating circumstance; and (4) weigh the aggravating circumstances against the mitigating circumstances to determine whether the death penalty is appropriate. See id. at 419-20. We concluded in Campbell that a mitigating circumstance "once found" by the trial court could not "be dismissed as having no weight." Id. at 420. Thus, the weighing process in Campbell contemplated that the trial court will first assign weight to all mitigating circumstances that have been established and only after assigning weights to the mitigating circumstances will the trial court attempt to determine if the mitigating evidence collectively outweighs the aggravating circumstance under the facts and circumstances of that case.
*1139 Neither the United States Supreme Court in Lockett or Eddings nor this Court in Campbell has ever held that defendants must show not only that they possess evidence that warrants the imposition of a sentence less than death, but also that this proposed mitigating evidence be "mitigating under the facts in the case at hand." Majority op. at 1135. The majority's statement that a defendant's proposed mitigating evidence must be "mitigating under the facts in the case at hand" should not be read to suggest that an aspect of the defendant's background or character need not be given weight unless the defendant can first show its relationship to the crime in question. Although in Eddings the Supreme Court stated that courts must weigh "relevant mitigating evidence," it is clear from Eddings that when the Court uses the term "relevant mitigating evidence" it is referring to any aspect of a defendant's character or record that the defendant proffers as a basis for imposing a sentence other than death.
For instance, in Campbell, we provided a nonexhaustive list of valid nonstatutory mitigating circumstances. 571 So.2d at 419 n. 4. The list included: (1) abused or deprive childhood; (2) contribution to community or society as evidenced by an exemplary work, military, family, or other record; (3) remorse and potential for rehabilitation; (4) good prison record; and (5) charitable or humanitarian deeds. See id. Although defendants may introduce testimony establishing these mitigating circumstances, the vast majority of these nonstatutory mitigators would not be related to the crime or the case.
Further, the majority's decision should not be read as imposing an additional burden upon defendants in their efforts to present mitigating evidence. In Trease, we placed the burden on the trial court to demonstrate why a proposed mitigating circumstance is entitled to no weight for reasons or circumstances unique to that case. 768 So.2d at 1055. Our decision here should not be read to remove that obligation from the trial court.
Turning to the trial court's findings in this case, the trial court accorded no weight to the proposed mitigator that the defendant had a developmental age of fourteen. In its sentencing order, the trial court stated: "The Court finds this mitigating circumstance was proven, but for the reasons previously stated above, the Court affords this no weight whatsoever." Despite the expert testimony that the defendant's mental age at the time of the crimes was fourteen, the trial court stated that "[n]otwithstanding Dr. Mosman's testimony, the twenty-five witnesses which preceded him during the penalty phase of this trial clearly refuted several of the opinions advanced by Dr. Mosman. Although it may be said that the Defendant is not a particularly bright man, certain observations made by the lay witnesses plainly refute Dr. Mosman's testimony." Thus, it appears that the trial court rejected this proposed mitigator because it had not been established in this case by the preponderance of the evidencethe second step in Campbell. Clearly, if the defendant had a developmental age of fourteen, that would be a valid and relevant mitigating circumstance entitled to be given some weight.
In summary, although I understand that the majority has attempted to clarify Trease, I am concerned that trial courts could reach different conclusions as to whether a proposed mitigating circumstance is "mitigating under the facts in the case at hand" based on similar evidence. Given this potential for less uniformity in the finding and weighing of mitigating circumstances, the danger that the death penalty might not be imposed in a consistent *1140 and uniform manner increases. For all of these reasons, I conclude that the better course is to recede from Trease and return to our decision in Campbell that trial courts must find and give some weight to all mitigating evidence that "has been reasonably established by the greater weight of the evidence." 571 So.2d at 419.
ANSTEAD, J., concurs.
NOTES
[1] The court found that the following aggravating circumstances had been established for both murders and assigned each a degree of weight: (1) the murder was committed in an especially heinous, atrocious, or cruel manner (HAC) (great weight); (2) the murder was committed in a cold, calculated, and premeditated fashion (CCP) (great weight); (3) the murder took place during the commission of a sexual battery (great weight); and (4) Ford previously was convicted of another capital felony, i.e., the contemporaneous murder (great weight).
[2] The court addressed the following statutory mitigating circumstances as they related to both murders and assigned each a degree of weight: (1) no significant history of prior criminal activity (proven, some weight); (2) extreme mental or emotional disturbance (not proven, no weight); (3) extreme duress (not proven, no weight); (4) impaired capacity (not proven, no weight); (5) the young mental age of the defendant (proven, very little weight).
[3] The court addressed the following nonstatutory mitigating circumstances as they related to both murders and assigned each a degree of weight: (1) Ford was a devoted son (proven, very little weight); (2) Ford was a loyal friend (proven, very little weight); (3) Ford is learning disabled (proven, no weight); (4) mild organic brain impairment (not proven, no weight); (5) developmental age of fourteen (proven, no weight); (6) family history of alcoholism (this circumstance was proven but it is not mitigating vis-a-vis the death penalty in general, no weight); (7) chronic alcoholic (proven, very little weight); (8) diabetic (this circumstance was proven but it is not mitigating vis-a-vis the death penalty in general, no weight); (9) excellent jail record (proven, some weight); (10) engaged in self-improvement while in jail (proven, some weight); (11) the school system failed to help (proven, very little weight); (12) emotional impairment (not proven, no weight); (13) mentally impaired (not proven, no weight); (14) impaired capacity (not proven, no weight); (15) not a sociopath or a psychopath (this circumstance was proven but it is not mitigating vis-a-vis the death penalty in general, no weight); (16) not antisocial (this circumstance was proven but it is not mitigating vis-a-vis the death penalty in general, no weight); (17) the alternative sentence is life without parole (this circumstance was proven but it is not mitigating visa-vis the death penalty in general, no weight).
[4] Ford raises the following issues: (1) Whether the prosecutor made improper comments during closing argument in the guilt phase; (2) whether the prosecutor asked an improper question concerning "flesh" on the defendant's knife; (3) whether the indictment adequately charged Ford with child abuse; (4) whether the prosecutor made improper comments during closing argument in the penalty phase; (5) whether the evidence of CCP was sufficient to submit this aggravator to the jury and to support the finding of this aggravator; (6) whether the trial court properly considered all the mitigating evidence.
[5] The prosecutor argued as follows during closing argument in the guilt phase of the trial:

I suspect that many of you have heard the phrase that the best defense is a good offense. And what that means is in football or in soccer or even in war, the idea is that if one side keeps the other busy defending itself by attacking, then they can't mount their own attack. And in this case, a lot of the questions that relate to numbers and evidence logs and that sort of thing, the defense has very aggressively mounted an offensive to show that in some way this investigation wasn't a perfect investigation. I'm telling you it wasn't perfect. That's quite true.
But the issue is: Does the evidence that you have convince you beyond a reasonable doubt that the Defendant committed these crimes, not whether more could have been done or done differently. And in court a good offense does not cancel the truth. It doesn't cancel the truth. A good offense by the defense
At this point, defense counsel objected and moved for a mistrial. The court denied the motion but cautioned the prosecutor "to make sure that the burden remains with the State and that the argument is consistent with the burden."
[6] The prosecutor argued as follows during closing argument in the guilt phase of the trial:

Now, yes, some of the evidence logs and some of the various documents that were filled out later, were not filled out as meticulously as they could have. No question about it. But something interesting happened during the course of this trial. There were a number of individuals, number of attorneys, myself, Mr. Deifik [i.e., one of the prosecutors], Mr. Sullivan [i.e., one of the defense lawyers], for example, that got the numbers sometimes confused.
Mr. Sullivan, for example, at one point talked about the Fort Myers FDLE crime lab when it was actually the Tampa
At this point, defense counsel objected and moved for a mistrial. The court sustained the objection but denied the motion.
[7] The prosecutor, in discussing the complexities of DNA technology, argued as follows during closing argument in the guilt phase of the trial:

But, ladies and gentlemen, we rely on complicated scientific evidence and scientific devices all the time in very serious life and death situations that we don't really have a clue how they work. Think about it for a minute. When you get in an automobile and you're driving down the road at 65, 70 miles an hour and another vehicle is coming at you in the same state, 65, 70 miles an hour, you've got maybe five, ten feet between you and that vehicle as they pass. Do you fully understand all the workings of that automobile you're in? Do you understand that at your feet there's a metal block where gasoline is being pushed into it and there's an explosion of some sort? Do you understand how all of the wires and everythingwell, of course not.
Some of you may, but probably most of you don't. But that doesn't prevent you from using that technology and science to drive down the road. I'll give you another example; telephone. We use telephones all the time. But how many of us really understand the very sophisticated science that goes into a telephone.
Look at this. Can't you just hear a defense attorney questioning Alexander Graham Bell.
At this point, defense counsel objected and moved for a mistrial or a curative instruction. The court sustained the objection but denied the motion for a mistrial and request for a curative instruction.
[8] The prosecutor (i.e., a different prosecutor from the prosecutor involved in the three prior statements) argued as follows during the State's rebuttal argument at the close of the guilt phase of the trial:

Now, the defense counsel, towards the end of his argument, repeated, let's be fair here. Well, let us not forget that justice is due to the accuser as well as to the accused. An interesting illustration of the probative worth of Mr. Sullivan's arguments can be found in considering how he attacked the DNA evidence from the Defendant's knife.
He starts talking about Greg's DNA being in the knife debris, which is what the evidence from Dr. Ragsdale proved. Then after talking about the lunchtime interlude, how the gentlemen on the sod farm passed the knife around, suddenly the location of the DNA changes from the knife debris to the blade of the knife.
Now, we all know from our recollection of the evidence that the blood or the DNA on the blade of the knife was Mr. Ford's blood, not Gregory's blood, that Gregory's DNA came from the knife debris that Dr. Ragsdale found deep within the knife.
I would submit that a reasonable construction of that argument is similar to what went on during the trial where an exhibit of evidence was introduced by the State, identified by the witnesses, and then upon cross-examination, counsel started with the correct number, but halfway through we wound up with different numbers being talked about, sort of a bait and switch legal argument.
At this point, defense counsel objected and moved for a mistrial. The court sustained the objection, denied the motion, and gave a curative instruction: "The Court will now instruct the jury that you are to disregard the argument of the State in reference to conduct or actions of defense counsel. Instead, you are to focus on the evidence in this case."
[9] See Thomas v. State, 748 So.2d 970, 984 (Fla.1999) ("The courts of this state allow attorneys wide latitude to argue to the jury during closing argument.").
[10] See generally Duest v. State, 462 So.2d 446, 448 (Fla.1985) ("[A] mistrial is appropriate only when the error committed was so prejudicial as to vitiate the entire trial.").
[11] See, e.g., Goodwin v. State, 751 So.2d 537, 546 (Fla.1999) ("This Court's case law states that a trial court' ruling on a motion for mistrial is subject to an abuse of discretion standard of review.").
[12] During direct examination of Tracy, the prosecutor asked the following question:

Sir, drawing your attention to the item that is referred to as State's Exhibit 93-4 identified as extracted DNA from the flesh taken from the pocket knife seized from the
At this point, defense counsel objected and moved for a mistrial, noting that the term "flesh" had not been used before in reference to the knife. The trial court denied the motion but instructed the jury as follows:
All right. At this time the Court will direct the jury to disregard any reference to the word flesh that was used in the question that was just posed. The Court will now direct counsel to direct the witness' attention to the results of the analysis from the debris that had been located on the knife.
[13] See generally Duest v. State, 462 So.2d 446, 448 (Fla.1985) ("[A] mistrial is appropriate only when the error committed was so prejudicial as to vitiate the entire trial.").
[14] See, e.g., Goodwin v. State, 751 So.2d 537, 546 (Fla.1999) ("This Court's case law states that a trial court' ruling on a motion for mistrial is subject to an abuse of discretion standard of review.").
[15] See DuBoise v. State, 520 So.2d 260, 264-65 (Fla.1988) ("The reason for this provision is to discourage defendants from waiting until after a trial is over before contesting deficiencies in charging documents which could have easily been corrected if they had been pointed out before trial.... For example, the failure to include an essential element of a crime does not necessarily render an indictment so defective that it will not support a judgment of conviction when the indictment references a specific section of the criminal code which sufficiently details all the elements of the offense.").
[16] Count IX of the indictment charged Ford with the following crime: "CHILD ABUSE F.S. 827.03 THIRD DEGREE FELONY." The relevant text of the indictment read as follows: "The Grand Jurors of the County of Charlotte, State of Florida, impaneled and sworn to inquire and true presentment make in and for the County of Charlotte upon their oath do present that JAMES DENNIS FORD late of the County of Charlotte and State of Florida, on or about the SIXTH day of APRIL in the year of our Lord one thousand nine hundred and ninety-seven in the County and State aforesaid ... did unlawfully and willfully deprive a child, to wit: MARANDA MALNORY, or did allow said child to be deprived of, necessary food, clothing, shelter, or medical treatment, or did knowingly inflict or permit the infliction of physical or mental injury to said child, contrary to the form of the statute in such case made and provided and against the peace and dignity of the state of Florida."
[17] The prosecutor argued as follows during closing argument in the penalty phase of the trial:

Ladies and gentlemen, there is one common thread that runs through our criminal law that is absolutely essential for those laws to truly produce justice. And that is that people must be held accountable for their actions; that is, punishment must fit the crime.
At this point, defense counsel objected and the objection was overruled. The State continued:
That common thread is that the punishment should fit the crime. People must be held accountable for their actions. The rule of law in this nation, when it functions properly, is designed to fairly and justly hold the person accountable for their actions. The more serious the crime, the greater the accountability required by the law. That is if there will be true justice.
The prosecutor reiterated this point later in his closing argument.
[18] The prosecutor made the following comment during closing argument in the penalty phase of the trial when discussing the testimony of Ford's family and friends:

And what that testimony really boils down to is that this defendant has no excuse for his actions; no excuse at all.
Because he had the support of friends and family who cared for him. And he's let those people down. In a lot of ways it makes the crime itself that he committed even worse because by the testimony of his own friends and family he was not abused.
At this point, at the request of defense counsel, the court instructed the prosecutor to avoid using the term "excuse."
[19] The prosecutor argued as follows during closing argument in the penalty phase of the trial:

Now, justice is often portrayed as a lady holding scales and those scales are held in her hand, and she has a blindfold. And the blindfold is there for a reason. That reason is that justice, as she holds the scales, is not to be swayed by sympathy or prejudice or bias.
Much of the defendant's mitigation through the testimony of [ ] friends and family is an attempt to get Lady Justice to peek under the blindfold and tip the scale out of sympathy. And the Court has instructed you that sympathy is not something that you should consider.
At this point, defense counsel objected and the objection was overruled.
[20] The prosecutor argued as follows during closing argument in the penalty phase of the trial:

Dr. Greer said that the defendant was experiencing remorse. Is that really so? The defendant still denies that he killed the Malnorys, even to his own psychiatrist, even as recently as last week; despite the verdict in this case and the evidence in this case. Yet this doctor still doesn't believe that the defendant is lying or malingering.
How can there be true remorse without owning up to one's conduct? There is a difference between remorse and regret. The defendant regrets that the Malnorys are dead. That's what his doctor said. And certainly that's so because that has led him to jail, that has led to hurting his friends and family, and that has led to the end of family picnics and good times with drinking buddies; and it has led to the death penalty. Sure he has regrets, but remorse?
Periodically, as the mitigation testimony was coming in through his friends and family, I could not help but notice the defendant occasionally had tears in his eyes. And I'm sure some of you noticed that, too.
But I did not notice any similar tears in this eyes during the heart-wrenching testimony of what he did to the Malnorys. And that is because he feels very differently about his family and friends and he acted very differently around them. He showed a very different face to his family and friends. And he felt and acted very differently with the Malnorys.
The dictionary defines remorse as, quote, moral anguish arising from repentance for the past misdeeds. How can there be anguish, moral or otherwise, for past deeds if one refuses to admit that one did those deeds? You cannot repent from something that you deny. Ladies and gentlemen, this mitigator is not proven. The defendant, according to his own doctors, is not repentant.
At this point, defense counsel requested a bench conference. The court then instructed the jury to disregard the last comment by the prosecutor. The court also told the jury that the arguments were the attorneys' personal beliefs and were not to be considered by the jury during deliberations; the jurors were to rely upon their own recollection of the evidence.
[21] See Thomas v. State, 748 So.2d 970, 984 (Fla.1999) ("The courts of this state allow attorneys wide latitude to argue to the jury during closing argument.").
[22] See Moore v. State, 701 So.2d 545, 551 (Fla.1997).
[23] See Moore v. State, 701 So.2d 545, 551 (Fla.1997).
[24] See Valle v. State, 581 So.2d 40, 47 (Fla. 1991) ("The state may properly argue that ... the jury should not be swayed by sympathy.").
[25] See Valle, 581 So.2d at 46 ("[T]he state could have introduced the same evidence to rebut the testimony of his remorse presented by Valle in mitigation.").
[26] See generally Fla. Std. Jury. Instr. (Crim.) 109 ("Give only those aggravating circumstances for which evidence has been presented."). Cf. Fla. R.Crim. P. 3.380(a) ("If, at the close of the evidence for the state or at the close of all the evidence in the cause, the court is of the opinion that the evidence is insufficient to warrant a conviction, it may, and on the motion of the prosecuting attorney or the defendant shall, enter a judgment of acquittal.").
[27] See Willacy v. State, 696 So.2d 693, 695-96 (Fla.1997).
[28] Categories of statutory mitigating circumstances include the following: no prior criminal history, extreme mental disturbance, participation of the victim, minor role, extreme duress, impaired capacity, and age. See § 921.141(6)(a-g), Fla. Stat. (1997). A proposed factor is mitigating in nature if it falls within a statutory category. See infra note 31.
[29] See Campbell, 571 So.2d at 419 n. 4 ("A mitigating circumstance can be defined broadly as `any aspect of a defendant's character or record and any of the circumstances of the offense' that reasonably may serve as a basis for imposing a sentence less than death."). Categories of nonstatutory mitigating circumstances include but are not limited to the following: abused or deprived childhood, contribution to community or society, remorse and potential for rehabilitation, disparate treatment of an equally culpable codefendant, and charitable or humanitarian deeds. See Campbell, 571 So.2d at 419 n. 4.
[30] A factor is mitigating under the facts in the case at hand if it is shown to be mitigating by the greater weight of the evidence. See Campbell, 571 So.2d at 419 ("The court must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence." (footnote omitted)).
[31] See generally § 921.141(6), Fla. Stat. (1997) ("Mitigating circumstances shall be the following ...." (emphasis added)).
[32] See Trease v. State, 768 So.2d 1050, 1055 (Fla.2000) ("We therefore recognize that while a proffered mitigating factor may be technically relevant and must be considered by the sentencer because it is generally recognized as a mitigating circumstance, the sentencer may determine in the particular case at hand that it is entitled to no weight for additional reasons or circumstances unique to that case.").
[33] See Campbell, 571 So.2d at 420 ("[A] mitigating factor once found cannot be dismissed as having no weight.").
[34] See Campbell, 571 So.2d at 420 ("[T]he relative weight given each mitigating factor is within the province of the sentencing court.").
[35] See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
[36] See Jones v. State, 569 So.2d 1234, 1240 (Fla.1990) ("The potential sentence is a relevant consideration of `the circumstances of the offense' which the jury may not be prevented from considering."); see also Walker v. State, 707 So.2d 300, 315 (Fla.1997) ("We conclude that Walker was afforded what Florida and U.S. Supreme Court caselaw deem sufficient, i.e., the opportunity to argue to the jury potential parole ineligibility as a mitigating factor.").
[37] For instance, where the defendant is well-suited to imprisonment, life imprisonment may serve as a viable alternative to death, but where the defendant poses a threat to prison personnel and fellow inmates, life imprisonment may be viewed less favorably.
[38] Ford's remaining claims concerning mitigation are without merit.
[39] I also do not agree with the majority that the arguments listed in footnotes 18 and 19 are proper and within the wide latitude accorded in closing argument. The argument, that the fact that the defendant was not abused "makes the crime he committed even worse," amounts to impermissible nonstatutory aggravation. See Kormondy v. State, 703 So.2d 454, 463 (Fla.1997) (stating that when testimony is not directly related to proving a statutory aggravating circumstance and is outside of the scope of evidence properly presented by the State during the penalty phase, such evidence may "constitute[ ] impermissible nonstatutory aggravation"). As Justice Anstead explained in his concurring in part and dissenting in part opinion in Moore v. State, 701 So.2d 545, 552 (Fla.1997):

I cannot agree with the majority that it was permissible for the State to tell the jury that the appellant's entire case for mitigation was "the most aggravating factor of all" in determining whether appellant should be sentenced to death. This assertion constitutes a violation of this Court's consistent and repeated admonitions that the only matters that may be asserted in aggravation are those set out in the death penalty statute. A jury can hardly be expected to engage in a reasoned process of balancing aggravation and mitigation when it has been told by the State that it can and should add the defendant's evidence of mitigation to the aggravation side of the scales....
Id. (citations omitted).
Furthermore, the argument that "[m]uch of the defendant's mitigation through the testimony of [] friends and family is an attempt to get Lady Justice to peek under the blindfold and tip the scale out of sympathy," amounts to an attempt by the State to denigrate nonstatutory mitigation. This argument also misstates the law regarding the right of a defendant in a death penalty case to put on mitigating evidence. A defendant puts on mitigating evidence because the United States Supreme Court precedent provides the defendant with that right-not for the purpose of eliciting sympathy. See Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).