678 So.2d 1228 (1996)
Thewell HAMILTON, Appellant,
v.
STATE of Florida, Appellee.
No. 78576.
Supreme Court of Florida.
May 23, 1996.
Rehearing Denied August 29, 1996.
*1229 Nancy A. Daniels, Public Defender, and W.C. McClain, Assistant Public Defender, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General, and Gypsy Bailey, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Thewell Hamilton. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
On the evening of September 19, 1986, gunshots were heard emanating from the Holmes County house Thewell Hamilton shared with his wife, Madeleine, his teenaged stepson, Michael Luposello, and his two young children, Shannon (an infant) and Shaun (two years old). A neighbor, Lucille Watson, said she heard the shots between 7:30 and 8:00 p.m. when she was walking outside her house.
At approximately 7:30 p.m. an ambulance service received a distress telephone call from a man who stated that his family had been shot. Upon their arrival at the address given by the caller, the ambulance service personnel discovered the bodies of Madeleine and Michael, dead of multiple gunshot wounds. Hamilton wore a shirt that was spattered both front and back with blood and flesh. He mentioned that Madeleine's ex-husband had threatened her, but police later learned the man was in Washington, D.C., when the shootings occurred.
There was evidence that Madeleine suffered from substance abuse, was subject to erratic moods, and had a blood alcohol level of .014 at the time of her death.
Hamilton was convicted and sentenced to death on two counts of murder, but the convictions were reversed and a new trial ordered. Hamilton v. State, 547 So.2d 630 (Fla.1989).
At the retrial in 1989, Hamilton testified in his own behalf. He stated that Madeleine and his stepson Michael were arguing on the night in question, while he was in another room with his own children. Hamilton said he heard two shots.
When he came into the other room, he saw Madeleine holding the shotgun. According to Hamilton, a struggle for the gun ensued, during which time the weapon accidentally discharged toward Madeleine's legs. He helped Madeleine across the room to a sofa, but when he put the gun down it accidentally discharged again into Madeleine. Hamilton later contended that someone else had committed the shootings.
*1230 Experts differed as to how many shots struck Madeleine. One expert said she was shot twice in the leg and once in the chest, but another said he believed she was struck once in the legs and once in the chest. Michael had been shot twice, once to the chest and once to the back of the head.
Police found only four spent shotgun shell casings in the house and a sixteen gauge, double-barrel shotgun underneath a van parked seventy-five feet from the Hamilton house. Ballistics tests revealed that this was the shotgun used to shoot both Madeleine and Michael. The gun held only two rounds, and spent shells had to be manually removed before new shells could be loaded.
The State presented no additional evidence in the penalty phase. Hamilton testified of his offer to donate his heart to an 11-year-old boy and about his Christian faith. His younger brother testified that Hamilton was kind, gentle, and generous to a fault.
Hamilton was again convicted and the jury recommended death by a vote of seven-to-five. However, the trial court ordered a new sentencing hearing on grounds that a juror had improperly brought automobile magazines into the jury room during deliberations. This Court reversed the order on grounds the magazines were irrelevant to the issues at trial and that any resulting error was harmless. State v. Hamilton, 574 So.2d 124 (Fla.1991). Afterward, the trial court sentenced Hamilton to death.
The court found two aggravating circumstances: (1) that the homicides were heinous, atrocious, or cruel; and (2) that the killings were cold, calculated, and premeditated. In mitigation, the trial court found the following: (1) that Hamilton had no significant prior history of criminal activity; (2) Hamilton's age at the time of the offense (50); (3) the blood-alcohol level of Madeleine at the time of her death; and (4) Hamilton's good military record and good character.
In this appeal, Hamilton raises several issues. First, he argues that a statement he made to an investigator on October 16, 1986, should have been suppressed on grounds that police ignored Hamilton's reassertion of his rights to silence and to presence of counsel. The reassertion alleged by Hamilton consisted of a remark that his defense lawyer "told me not to talk to anyone on it"referring to the events surrounding the murders. Read in light of the entire taped interview, we find that Hamilton's statement did not constitute an assertion of his rights to silence or presence of counsel, equivocal or otherwise.
Hamilton himself had written the investigator asking the latter to visit him, and Hamilton then waived all his rights at the start of the interview. The evident purpose of this meeting was an effort by Hamilton to convince authorities that someone else had killed his wife and stepson. In this specific factual context, merely telling the officer about defense counsel's admonitions cannot reasonably be considered a reassertion of rights. Hamilton's entire course of conduct already had indicated a settled intent to ignore counsel's advice, and nowhere did he indicate that his own desire was to reassert his rights. As the United States Supreme Court has noted,
the interrogation must cease until an attorney is present only [i]f the individual states that he wants an attorney.
Moran v. Burbine, 475 U.S. 412, 433 n. 4, 106 S.Ct. 1135, 1147 n. 4, 89 L.Ed.2d 410 (1986). Hamilton simply did not do that here. We accordingly find no error.
Second, Hamilton contends that the State improperly introduced hearsay testimony from his son, who allegedly had said, "Daddy you killed mommie." This hearsay came into evidence as part of the recorded statement Hamilton himself gave to the investigator on October 16, 1986, which was the subject of the suppression hearing discussed above. Because the defense did not object to this particular statement on hearsay grounds, that issue now is procedurally barred. It is irrelevant that on initial appeal we found similar hearsay from a state social worker inadmissible, Hamilton, 547 So.2d at 633, because the issue in that instance had been properly preserved for review. Once the hearsay statement was in evidence, the State then was entitled to comment upon it. We find no error in the way these comments *1231 were made, since they constituted a paraphrase.
As his third issue, Hamilton argues that the two aggravating factors were improperly found by the trial court. We must begin by acknowledging a holding we made in the initial direct appeal of this case:
Although our decision on the issues raised thus far requires reversal, we believe it is necessary to discuss the application of two of the aggravating circumstances to these facts. Although the trial court provided a detailed description of what may have occurred on the night of the shootings, we believe that the record is less than conclusive in this regard. Neither the state nor the trial court has offered any explanation of the events of that night beyond speculation. Nonetheless, the court found that the crimes were heinous, atrocious, or cruel and that they were committed in a cold, calculated manner with a heightened sense of premeditation. There is no basis in the record for either of these findings. Aggravating factors must be proven beyond a reasonable doubt. The degree of speculation present in this case precludes any resolution of that doubt.
547 So.2d at 633. The State candidly concedes that, at retrial, it called essentially the same witnesses during the guilt phase and presented no additional evidence in the penalty phase. However, the State contends that the guilt-phase witnesses presented more detailed testimony justifying the two aggravating factors.
As to the factor of cold, calculated premeditation, we find nothing in the record suggesting that the additional detail alters the holding we issued on initial appeal. The fact remains that no motive for these murders was ascertained at trial, much less that they exhibited the "careful plan or prearranged design" required to establish the factor. See Rogers v. State, 511 So.2d 526 (Fla.1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). A careful plan or prearranged design presupposes a reason for the murder, which the State did not prove here. Moreover, the evidence adduced below is equally consistent with a heat-of-passion killing, which by definition cannot fulfill the "coldness" requirement of the factor. Accordingly, the factor of cold, calculated premeditation was not proven beyond a reasonable doubt.
As to the factor of heinous, atrocious, or cruel, the State likewise argues that the additional detail presented in the guilt phase somehow established the requisite desire to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of the victims. See Santos v. State, 591 So.2d 160, 163 (Fla.1991). Yet on this point the trial court itself noted:
It is unclear whether the two shots fired into the body of Michael Luposello was prior to or after the shots fired into the body of Madeline Hamilton. If Michael Luposello was shot first, then the gun would have had to be reloaded two times before the third shot was fired into the body of Madeline Hamilton. If Madeline Hamilton was shot first, then the Defendant would have had to have reloaded the gun two times before the second shot was fired into Michael Luposello. This assumes that the Defendant finished shooting one victim before proceeding to the other. However, the Defendant may have shot one victim one time and then proceeded to shoot the second victim and, then returned to the first victim. Either way, the Defendant would have had to stop, extract the shells from the murder weapon, and reload it after it was fired two times. The evidence outlined above establishes a heightened premeditation beyond a reasonable doubt and made the killings especially heinous and atrocious and establish that the killings were committed in a cold, calculated and premeditated manner.
(Emphasis added.)
If the emphasized sentence above is true, then the two victims were struck down nearly simultaneously. Moreover, the fact that the gun was reloaded does not, without more, establish intent to inflict a high degree of pain or otherwise torture the victims. Reloading certainly can support such a conclusion in a proper case, but in the context of a domestic quarrel such as this it also can be *1232 consistent with a rage killing that lacks the intent described in Santos.
The facts of Santos themselves are instructive. There, Mr. Santos was engaged in an ongoing quarrel with a woman who had borne his child. Much of their difficulty centered around the fact the child had not received Santos' surname and his belief that he was not being given fair visitation privileges. Their quarrel escalated until Santos threatened to kill her. Two days later he appeared with a gun, chased down mother and child, and shot them both to death. All seven members of the Court agreed that the factor of heinous, atrocious, or cruel did not exist because there was "no substantial suggestion that Santos intended to inflict a high degree of pain or otherwise torture the victims." Santos, 591 So.2d at 163.
The fact that the gun was reloaded here at first blush distinguishes this case from Santos, but in all other respects the two cases are highly similar. So, the relevant question we face is whether the facts surrounding the reloading of the gunupon which the trial court solely relied in finding this aggravating factor, and which also was before this Court in the prior appealwere sufficient to establish beyond and to the exclusion of every reasonable doubt that Hamilton intended to inflict a high degree of pain or otherwise torture the victims. Once again, we cannot overlook the fact that no motive for these killings was established by the state either at trial or retrial, much less that the motive encompassed the required torturous intent. Because the relevant facts are essentially the same as those presented to us on initial direct appeal, we are constrained to conclude that our prior holding regarding the factor of heinous, atrocious, or cruel must stand. The trial court erred in finding the factor.
Our foregoing conclusion establishes that no valid aggravating factors remain. The State urges us to take into account the aggravating factor of previous conviction of a prior violent felony, consisting of either one of the simultaneous murders here. Nevertheless, the trial court did not instruct the jury on this factor, and the State did not object. Nor did the State object or file a cross-appeal when the trial court issued its findings omitting the prior-felony factor. The Supreme Court of Florida is not a fact-finding body when it sits to hear appeals in death cases, art. V, § 3(b)(1), Fla. Const., and we thus would usurp the constitutional role of the trial courtand indeed violate due processif we assumed some authority to manufacture aggravating factors the lower tribunal has not found. We are constrained by the four corners of the findings below; and because those findings include no valid aggravating factors, death is not a permissible penalty. Banda v. State, 536 So.2d 221 (Fla.1988), cert. denied, 489 U.S. 1087, 109 S.Ct. 1548, 103 L.Ed.2d 852 (1989).
All remaining issues raised by the parties pertain to the penalty phase alone and are therefore moot. Hamilton's convictions are affirmed, but the death sentences are vacated and this cause is remanded for Hamilton to be resentenced to life imprisonment on each of the two first-degree murder convictions.
It is so ordered.
GRIMES, C.J., and OVERTON, SHAW, KOGAN, HARDING and ANSTEAD, JJ., concur.
WELLS, J., concurs as to the conviction and concurs in result only as to the sentence.