860 So.2d 960 (2003)
Joel DIAZ, Appellant,
v.
STATE of Florida, Appellee.
No. SC01-278.
Supreme Court of Florida.
September 11, 2003.
Rehearing Denied November 18, 2003.
*962 James Marion Moorman, Public Defender, and Steven L. Bolotin, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Stephen D. Ake, Assistant Attorney General, Tampa, FL, for Appellee.
*963 PER CURIAM.
We review a judgment and sentence of death after the conviction of first-degree murder of Joel Diaz. We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Diaz's conviction and sentence of death.

I.
Diaz and Lissa Shaw dated for about two years. During the second year of their relationship, they lived in Diaz's home with Lissa's young daughter. The relationship proved "rocky," however, and around August 1997 Lissa moved in with her parents, Charles and Barbara Shaw. After she moved out, Diaz tried to see her, but she refused all contact. The two last spoke to each other in September 1997.
On October 6, Diaz purchased a Rossi.38 special revolver from a local pawn shop. He was eager to buy the gun, but because of a mandatory three-day waiting period, could not take it with him. Three days later, Diaz returned to the pawn shop to retrieve the gun, but it could not be released to him because his background check remained pending. Diaz was irritated, and continued to call the shop nearly every day until he was cleared. On October 16, Diaz finally was allowed to take the gun.
On October 27, Diaz asked his brother Jose, who was living with him at the time, for a ride to a friend's house the next morning. Sometime that night or early the next morning, Diaz wrote a letter to his brother, which the police later discovered in his bedroom. It reads:
Jose [f]irst I want to apologize for using you or to lieing to you to take me where you did I felt so bad but there was no other way. Theres no way to explain what I have to do but I have to confront the woman who betrayed me and ask her why because not knowing is literly [sic] killing me. What happens then is up to her.
If what happen is what I predict than I want you to tell our family that I love them so much. Believe me I regret having to do this and dieing knowing I broke my moms heart and my makes it even harder but I cant go on like this it's to much pain. Well I guess that all theres to say I love you all.
Joel
P.S. Someone let my dad know just because we werent close doesn't mean I don't love him because I do.
At 5:30 a.m. on October 28, Diaz's brother and his brother's girlfriend drove him to the entrance of the Cross Creek Estates subdivision, where the Shaws lived. Diaz carried his new gun, which was loaded, and replacement ammunition in his pocket. Diaz walked to the Shaws' house and waited outside for about ten minutes.
At 6:30 a.m., Lissa Shaw left for work. She entered her car, which was parked in the garage, started the engine, and remotely opened the garage door. She saw someone slip under the garage door, and when she turned, Diaz stood at her window, pointing the gun at her head. He told her to get out of the car. She pleaded with him not to hurt her. When she saw that "the situation was not going anywhere," she told him, "Okay, okay, hold on a second, let me get my stuff," and leaned down as if retrieving personal items. She then shoved the gear into reverse and stepped on the gas pedal. Diaz started shooting. Lissa heard three shots, but did not realize she had been hit. As she continued backing out, the car struck an island behind the driveway. She then put the car into forward drive. As she drove away, she saw Diaz in the front yard pointing the gun at her father, Charles Shaw. Charles was about five feet from Diaz, *964 pointing and walking toward him. Lissa drove herself to the hospital where it was discovered she had been shot in the neck and shoulder.
Charles and Diaz then had some sort of confrontation in the front yard and an altercation in the garage, resulting in Diaz chasing Charles into the master bedroom where Barbara was lying in bed. A quadriplegic, Barbara could not move from the bed.
As the two men moved through the house, Barbara heard Charles saying, "Calm down, put it down, come on, calm down, take it easy." Barbara was able to roll back to see Diaz standing in the bedroom with a gun. He was standing on one side of a chest of drawers, closer to the door, while Charles was standing on the other side of the chest, closer to the bathroom. Charles talked to Diaz, telling him to calm down and put down the gun. Diaz held the gun with two hands, pointing it straight at Charles, about six to eight inches from Charles's chest. Diaz pulled the trigger, but the gun, out of ammunition, only clicked. Charles visibly relaxed, but Diaz reloaded the gun. When Charles realized Diaz was reloading, he ran into the bathroom. Diaz followed. As Charles turned to face him, Diaz fired three shots. Charles's knees buckled, and he grabbed his midsection and fell face first to the floor.
Diaz went back into the bedroom and stood beside Barbara, holding the gun. Barbara screamed, "Why did you do this?" Diaz answered that Charles deserved to die. He stood in the bedroom from 30 seconds to a minute, then returned to the bathroom, bent over Charles's body, extended his right arm, and shot Charles again. He then moved his arm left, which Barbara judged to be toward Charles's head, and shot again. Diaz returned to the bedroom and, according to Barbara, said, "If that bitch of a daughter of yours, if I could have got her, I wouldn't have had to kill your husband."
Diaz remained in the house between 45 minutes and an hour. He spent some of this time talking to Barbara in the bedroom, where he passed the gun from hand to hand and unloaded and loaded the gun about three or four times. He remained in the house until the police arrived and arrested him.[1]
The jury found Diaz guilty of the firstdegree murder of Charles Shaw, the attempted first-degree murder of Lissa Shaw, and aggravated assault with a firearm on the neighbor. After penalty phase proceedings, the jury recommended a sentence of death by a vote of nine to three. After a Spencer[2] hearing, the trial court found three aggravating circumstances[3] and five statutory mitigating circumstances,[4] and sentenced Diaz to death.
*965 Diaz raises three issues on appeal: (1) whether the trial court erred in finding and instructing the jury on the HAC aggravating factor; (2) whether the trial court erred in finding and instructing the jury on the CCP aggravating factor; and (3) whether the death sentence is disproportionate.[5] Although Diaz does not contest the sufficiency of the evidence for his conviction of first-degree murder, we must nevertheless independently determine whether the evidence is sufficient. See Brown v. State, 721 So.2d 274, 277 (Fla. 1998); Fla. R.App. P. 9.140(h). Based on our review, we find that there is competent, substantial evidence to support the verdict. We have outlined that evidence in detail above.

II.
Diaz first argues that the trial court erred in finding and instructing the jury on the HAC aggravating factor.[6] When evaluating claims alleging error in the application of aggravating factors, this Court does not reweigh the evidence to determine whether the State proved each factor beyond a reasonable doubt. See Alston v. State, 723 So.2d 148, 160 (Fla. 1998). Rather, we must "determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Id. (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)).
In determining the circumstances in which the HAC aggravating factor is intended to apply, we must remember the genesis for this statutory aggravating factor, as well as all other aggravating factors found in Florida's death penalty statute. See § 921.141(5), Fla. Stat. (2001). In Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and subsequent decisions, the United States Supreme Court declared unconstitutional the death penalty statutes existing in most states, including Florida. The Supreme Court held that the death penalty in those states, by leaving too much discretion to the individual judge in deciding whether to impose the death penalty, constituted cruel *966 and unusual punishment under the Eighth Amendment. Id. at 239-40, 92 S.Ct. 2726. In reaction, many states, including Florida, amended their statutes to include certain "aggravating factors" that would distinguish between routine murders (if any murder may be called routine) and those exhibiting a heightened sense of depravity, for which a sentence of death would be appropriate.
The statutory provision listing the HAC aggravating factor provides that for this factor to apply, the capital felony must be "especially heinous, atrocious, or cruel." § 921.141(5)(h), Fla. Stat. (1997) (emphasis added). See also Amoros v. State, 531 So.2d 1256, 1260 (Fla.1988) ("First-degree murder is a heinous crime; however, this statutory aggravating circumstance requires the incident to be `especially heinous, atrocious, and cruel [sic].'"); Tedder v. State, 322 So.2d 908, 910 (Fla.1975) ("It is apparent that all killings are atrocious.... Still, we believe that the Legislature intended something `especially' heinous, atrocious, or cruel when it authorized the death penalty for first degree murder.").[7] Recognizing that all murders, by their very nature, are in some way either heinous, or atrocious, or cruel, this provision is designed to identify those murders that, because of their heightened depravity, deserve imposition of a death sentence. See Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (explaining that the aggravating circumstance "may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder"). As we stated in State v. Dixon, 283 So.2d 1, 9 (Fla.1973), just months after the Florida Legislature amended the death penalty statute to conform with Furman and its progeny:
It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
We therefore have held that for this factor to apply, the murder must be conscienceless or pitiless and unnecessarily torturous to the victim. Buckner v. State, 714 So.2d 384, 390 (Fla.1998); Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996), cert. denied, 522 U.S. 825, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997).
We have consistently held that instantaneous or near instantaneous deaths by gunshot, unaccompanied by additional acts to mentally or physically torture the victim, are not especially heinous, atrocious, or cruel. See Rimmer v. State, 825 So.2d 304, 327-28 (Fla.2002) (finding that evidence did not support HAC where the record did not reveal that the defendant tortured the victims or subjected them to pain and suffering), cert. denied, 537 U.S. *967 1034, 123 S.Ct. 567, 154 L.Ed.2d 453 (2002); Donaldson v. State, 722 So.2d 177, 186-87 (Fla.1998) (striking HAC where the defendant forced the victims into a house at gunpoint and, along with accomplices, interrogated them for several hours before handing the gun to an accomplice to shoot the victims); Ferrell v. State, 686 So.2d 1324, 1330 (Fla.1996) ("Execution-style killings are not generally HAC unless the state has presented other evidence to show some physical or mental torture of the victim."); Robinson v. State, 574 So.2d 108, 112 (Fla.1991) (holding that the trial court erred in finding HAC because the fatal shot to the victim "was not accompanied by additional acts setting it apart from the norm of capital felonies, and there was no evidence that it was committed `to cause the victim unnecessary and prolonged suffering'"). In other words, "a murder by shooting, when it is ordinary in the sense that it is not set apart from the norm of premeditated murders, is as a matter of law not [especially] heinous, atrocious, or cruel." Lewis v. State, 398 So.2d 432, 438 (Fla.1981).
In this case, competent substantial evidence does not support a finding that this factor applies. We first note that portions of the sentencing order finding HAC are not supported by competent substantial evidence. The sentencing order repeatedly states that Diaz "slowly reloaded" the revolver as the victim retreated into the bathroom. The trial testimony, however, indicated simply that Diaz reloaded the gun while the victim ran into the bathroom, not that he did so "slowly."
More problematic is the trial court's characterization of the medical examiner's testimony. The trial court found that the "first three shots to the abdomen and calf were not immediately fatal and were survivable," and the medical examiner "stated that the final two shots at Mr. Shaw were to the upper chest and the back of the head." These findings are not supported in the record. The medical examiner, Dr. Huser, described five gunshot wounds, but could not determine their sequence. Dr. Huser did not state that the first three shots were to the abdomen and calf, or that the final two shots were to the upper chest and the back of the head.
This Court has struck the HAC aggravator in substantially similar cases where no evidence showed that the defendant intended to cause the victim unnecessary and prolonged suffering. For example, in Bonifay v. State, 626 So.2d 1310 (Fla. 1993), the defendant and another man each shot the victim once in the body from outside the store where the victim was working. The defendant and his accomplice then entered the store and broke open cash boxes. During this time the victim was lying on the floor begging for his life and talking about his wife and children. The defendant told the victim to shut up and fatally shot him twice in the head. We found that these facts did not support the HAC aggravator, noting that "[t]he fact that the victim begged for his life or that there were multiple gunshots is an inadequate basis to find [HAC] absent evidence that Bonifay intended to cause the victim unnecessary and prolonged suffering." Id. at 1313. See also Buckner, 714 So.2d at 390 (concluding that the trial court erred in finding HAC because the entire episode took only a few minutes and no evidence reflected that the defendant intended to subject the victim to any prolonged or torturous suffering); Hartley, 686 So.2d at 1323 (rejecting a finding of HAC where the medical examiner could not determine the order in which the shots had been fired, no evidence showed that the defendant deliberately shot the victim to cause him unnecessary suffering, and the evidence reflected that the murder *968 was carried out quickly); Kearse v. State, 662 So.2d 677, 686 (Fla.1995) (rejecting HAC where the victim sustained extensive injuries from numerous gunshot wounds because no evidence showed that the defendant intended to cause the victim unnecessary and prolonged suffering); Wickham v. State, 593 So.2d 191, 192 (Fla.1991) (finding that the facts did not support HAC where the defendant shot the victim in the chest, the victim pled for his life, and the defendant then shot victim twice in the head). We have also held that the mere act of reloading a gun does not justify a finding of HAC. See Hamilton v. State, 678 So.2d 1228, 1232 (Fla.1996) (noting the fact that the gun was reloaded does not, without more, establish an intent to inflict a high degree of pain or otherwise torture the victim); Clark v. State, 609 So.2d 513, 514 (Fla.1992) ("The fact that it took more than one shot to kill this victim does not set this crime apart from the norm of capital felonies, and there is no indication that the crime was committed in such a manner as to cause unnecessary and prolonged suffering to the victim.").
Here, the murder was carried out quickly, the medical examiner could not determine the order in which the shots had been fired, and the fact that the gun was reloaded does not, without more, establish an intent to inflict a high degree of pain or otherwise torture the victim. Therefore, we conclude that under the particular circumstances of this case the trial court erred in finding the HAC aggravating factor. We find this error harmless, however, after consideration of the two remaining aggravating circumstances and the five mitigating circumstances in this case. See Hill v. State, 643 So.2d 1071, 1073 (Fla. 1994) ("When this court strikes one or more aggravating circumstances relied upon by a trial judge in sentencing a defendant to death, we may conduct a harmless error analysis based on what the sentencer actually found in determining whether the sentence of death is still appropriate.").

III.
Diaz next argues that the trial court erred in finding and instructing the jury on the CCP aggravating factor.[8] Again, we note that when evaluating claims alleging error in the application of aggravators, this Court does not reweigh evidence to determine whether the State proved each factor beyond a reasonable doubt. See Alston, 723 So.2d at 160. Rather, our function simply is "to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Id. (quoting Willacy, 696 So.2d at 695).
To establish CCP, the evidence must show "that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), ... that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), ... that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification." Jackson v. State, 648 So.2d 85, 89 (Fla. 1994) (citations omitted). Diaz concedes the fourth prong.

*969 A.
Diaz first argues the trial court applied the wrong rule of law by using, and by allowing the jury to use, the theory of transferred intent to support this aggravator. We disagree. We addressed a similar issue in Provenzano v. State, 497 So.2d 1177 (Fla.1986), cert. denied, 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 518 (1987). In Provenzano, the defendant planned to kill two police officers who had arrested him for disorderly conduct. Armed with three loaded guns, Provenzano went to the courthouse for his trial. A bailiff was instructed to search him, but when Provenzano reached into his pocket, the bailiff started to grab him and Provenzano shot the bailiff in the face. Provenzano then chased and fired at least two shots at a corrections officer. Hearing the shooting, a bailiff from an adjacent courtroom heard the shots and ran into the hallway. Provenzano shot and killed him. Id. at 1180. On appeal, Provenzano contended that the CCP factor did not apply because proof that he planned to kill the police officers who had arrested him was irrelevant to finding enhanced premeditation to kill the bailiff. We disagreed, finding that the heightened premeditation necessary for this circumstance "does not have to be directed toward the specific victim. Rather, as the statute indicates, if the murder was committed in a manner that was cold and calculated, the aggravating circumstance of heightened premeditation is applicable." Id. at 1183.
Similarly, in Sweet v. State, 624 So.2d 1138 (Fla.1993), the defendant argued that the trial court erred in finding CCP where the victim was not the subject of the planning. In affirming the trial court's finding, we noted that "the key to this factor is the level of preparation, not the success or failure of the plan, and we therefore reject Sweet's argument that because there were survivors of the shooting this aggravator is not applicable." Id. at 1142. See also Howell v. State, 707 So.2d 674, 682 (Fla.1998) (rejecting the defendant's challenge to the CCP aggravator because the heightened premeditation necessary for CCP need not be directed toward the specific victim); Bell v. State, 699 So.2d 674, 677-78 (Fla.1997) (finding CCP valid although the victims were not the subjects of the planning because the heightened premeditation necessary for a CCP finding does not have to be directed toward the specific victim). Because it is clear that the heightened premeditation necessary to find the CCP factor need not be directed toward the specific victim, we find that the trial court did not err by using the theory of transferred intent in this case.

B.
Diaz also argues the trial court erred in finding the murder to be cold and calculated. We find that competent substantial evidence supports the trial court's finding.
To satisfy the "cold" prong of CCP, the killing must be the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage. Jackson, 648 So.2d at 89 (citing Richardson v. State, 604 So.2d 1107, 1109 (Fla. 1992)). This element generally has been found absent only for "heated" murders of passion, in which the loss of emotional control is evident from the facts. See Walls v. State, 641 So.2d 381, 387-88 (Fla. 1994). The "calculated" prong requires "that the defendant had a careful plan or prearranged design to commit murder before the fatal incident." Jackson, 648 So.2d at 89.
The events that ended in Mr. Shaw's murder demonstrate both the cold and calculated prongs of CCP. We disagree with *970 Diaz's argument that this incident was a heated murder of passion committed by a young man under intense emotional pressure. The murder occurred more than one month after Diaz had last spoken with Lissa. The attenuation between this contact and the murder shows that Diaz's decision to confront Lissa on October 28 was not prompted by a sudden, emotional reaction to the status of their relationship. Also, Diaz purchased and took possession of a firearm with ammunition several days before the murder. He outlined his plan in a letter to his brother the previous night, stating that he had to "confront the woman who betrayed me and ask her why because not knowing is literaly [sic] killing me." He then took his gun and several rounds of replacement ammunition to the Shaws' house. These facts show that Diaz calculated his actions long before the morning of October 28. They also demonstrate why we disagree with Diaz's assertion that the altercation with the victim in the garage negates CCP. Circumstantial evidence of an altercation between Diaz and the victim is simply not enough to vitiate CCP in light of the ample evidence of Diaz's calculated planning on the days preceding the murder.
Moreover, Diaz was aware of Lissa's schedule. Knowing that she left her parents' house at 6:30 a.m. for work, he asked his brother for a ride to a friend's house at 5:30 that morning. He then waited outside the house until the garage door opened, slipped under the door as it was going up, and confronted Lissa as she sat in her car. Finally, Diaz's statement to Barbara Shaw that "if that bitch of a daughter of yours, if I could have got her, I wouldn't have had to kill your husband" is evidence of a calculated plan to kill Lissa Shaw. Taken together, this evidence shows a careful plan or prearranged design to commit murder. See, e.g., Swafford v. State, 533 So.2d 270 (Fla.1988), cert. denied, 489 U.S. 1100, 109 S.Ct. 1578, 103 L.Ed.2d 944 (1989) (CCP murder can be indicated by the circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course).
Our decision in Amoros v. State, 531 So.2d 1256 (Fla.1988), on which Diaz relies, is distinguishable. In Amoros, we found insufficient evidence to establish CCP because the defendant did not know the victim and shot him within two minutes after entering the premises for the purpose of confronting and probably shooting his former girlfriend. Id. at 1260. This Court found that the only evidence of a plan was Amoros's threat to his former girlfriend, and no evidence established that Amoros knew the victim when he entered the apartment or was aware that the victim was residing with his former girlfriend. Id. Here, there was ample evidence of Diaz's plan and evidence that Diaz knew the victim resided in the house.

IV.
Finally, Diaz argues that his death sentence is disproportionate. Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). In deciding whether death is a proportionate penalty and to ensure uniformity in the imposition of the death sentence, this Court reviews and considers all the circumstances in a case in relation to other capital cases. See Johnson v. State, 720 So.2d 232, 238 (Fla.1998); Urbin v. State, 714 So.2d 411, 416-17 (Fla. 1998). The death penalty is reserved for cases where the most aggravating and the least mitigating circumstances exist. See Kramer v. State, 619 So.2d 274, 278 (Fla. 1993). When compared to other decisions *971 of this Court, the death sentence in this case is proportionate.
Although we have rejected the trial court's finding of HAC, two valid aggravators remain: (1) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification; and (2) the defendant was previously convicted of another capital felony or of a felony involving use or threat of violence to the person. As we noted in Dixon, "When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances...." 283 So.2d at 9. CCP is one of the "most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So.2d 90, 95 (Fla. 1999). The trial court also found five statutory mitigating circumstances. See supra note 4.
Diaz argues that this Court has consistently found death sentences disproportionate when the heated and emotional nature of the case negates cold calculation. Diaz cites cases holding that, in some circumstances, "the fact that the ... killing arose from a domestic dispute tends to negate cold, calculated premeditation." Santos v. State, 591 So.2d 160, 162 (Fla. 1991).[9] We already have found, however, that this murder was cold and calculated. This case is not properly characterized as a "heated, domestic confrontation," or even as an incident resulting from a domestic dispute. At the time of the murder, Diaz and Lissa Shaw no longer lived together, were not involved in a relationship, and in fact, had not spoken for over a month. Moreover, Diaz planned to murder Lissa with no purported domestic provocation, such as a new love interest in Lissa's life. Simply because Diaz and Lissa Shaw once had a domestic relationship does not transform this case into a "domestic dispute."
Even if this case were properly characterized as a domestic dispute, we have upheld the imposition of the death penalty in such circumstances. See, e.g., Pope v. State, 679 So.2d 710 (Fla.1996) (finding defendant's death sentence proportionate for beating and stabbing death of girlfriend where there were two aggravators, both statutory mental mitigators, and several nonstatutory mitigators).
After thoroughly reviewing the circumstances in this case and comparing them to other cases, we find Diaz's death sentence proportionate. See, e.g., Shellito v. State, 701 So.2d 837, 845 (Fla.1997) (concluding death sentence proportional in a shooting death where trial court properly found two aggravatorsprior violent felony conviction and pecuniary gain/commission during a robberyand nonstatutory mitigation consisting of alcohol abuse, a mildly abusive childhood, difficulty reading, and a learning disability); Hudson v. State, 538 So.2d 829, 831 (Fla.1989) (upholding death sentence where defendant entered his exgirlfriend's house two months after breaking up with her and killed her roommate, and the trial court properly found two aggravatorsprevious conviction of a violent felony and murder committed during an armed burglaryand three statutory mitigators).

V.
Based on the foregoing, we affirm Diaz's conviction for the first-degree murder of Charles Shaw and the imposition of a sentence of death.
It is so ordered.
*972 WELLS, QUINCE, and CANTERO, JJ., concur.
LEWIS, J., concurs as to the conviction and concurs in result only as to the sentence.
PARIENTE, J., concurs as to the conviction and dissents as to the sentence with an opinion, in which ANSTEAD, C.J., and SHAW, Senior Justice, concur.
PARIENTE, J., concurring as to the conviction and dissenting as to the sentence.
I concur in the affirmance of the conviction. I also agree that the HAC aggravator should be stricken, and thus concur in Part II of the majority opinion. However, I dissent from the affirmance of the death sentence for two reasons. First, I cannot conclude that the trial court's reliance on the invalid HAC aggravator is harmless error beyond a reasonable doubt. Second, I disagree with the Court's determination in Part III of the majority opinion that competent, substantial evidence supports the CCP aggravator under the theory of transferred intent.

HAC AND HARMFUL ERROR
I do not agree that after striking the HAC aggravator, on which the jury was instructed and which the trial court found, this Court can state beyond a reasonable doubt that the error did not contribute to the imposition of the death penalty. Under Hill v. State, 643 So.2d 1071, 1073 (Fla.1994), which is cited by the majority, error in finding an impermissible aggravator can only be harmless beyond a reasonable doubt if there is "no reasonable possibility" that the evidence presented in mitigation is sufficient to outweigh the remaining aggravators.
In this case, there was a nine-to-three vote on the advisory sentence and substantial mitigation, including the finding that the murder was committed while the defendant was under the influence of extreme emotional disturbance, the age of the defendant at the time of the offense, and the defendant's lack of a significant history of prior criminal activity. Thus, the erroneous submission of the weighty aggravator of HAC[10] to the jury and the trial court's reliance on HAC in the sentencing order cannot be harmless beyond a reasonable doubt in their effect on the jury recommendation and imposition of the death penalty. Consequently, I believe that striking the HAC aggravator alone requires that we reverse Diaz's sentence and remand for a new penalty phase.

CCP AND TRANSFERRED INTENT
I would also strike the CCP aggravator because the doctrine of transferred intent, relied on by the majority, is not applicable in this case. Diaz clearly acted with heightened premeditation in planning the killing of his former girlfriend, Lissa Shaw, and seriously wounded her in committing attempted murder as she fled from Diaz when he confronted her at her parents' home. The murder of her father, Charles Shaw, occurred some minutes later, after a confrontation that began in the yard and then moved to the garage and a bedroom of the Shaw home.
Diaz did not shoot Charles Shaw in the course of the attempted murder of Lissa. Diaz's first attempt to shoot Charles failed because his gun was out of ammunition. Diaz reloaded his weapon, followed Charles into the bathroom of the house, *973 and shot him three times. These actions provide ample evidence of a killing upon reflection that establishes the element of premeditation in the first-degree murder of Charles Shaw independently from the heightened premeditation supporting the attempted murder of Lissa Shaw. In other words, there is no need in this case to rely on Diaz's premeditated intent to kill Lissa as a basis for finding a premeditated intent to kill Charles.
In my view, the statutory provision defining CCP and the standard jury instruction thereon require that the heightened premeditation supporting CCP arise from the element of "premeditated design" supporting the conviction of first-degree murder under section 782.04(1)(a)1, Florida Statutes (1997). Section 921.141(5)(i), Florida Statutes (1997), defines the CCP aggravator as follows:
The capital felony was a homicide and was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification.
The standard jury instruction on CCP, given in this case, provides:
[As I have previously defined for you] a killing is "premeditated" if it occurs after the defendant consciously decides to kill. The decision must be present in the mind at the time of the killing. The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the killing. The period of time must be long enough to allow reflection by the defendant. The premeditated intent to kill must be formed before the killing.
However, in order for this aggravating circumstance to apply, a heightened level of premeditation, demonstrated by a substantial period of reflection, is required.
Fla. Std. Jury Inst. (Crim.) 7.11. Under both the statutory provision and the jury instruction, the premeditated intent supporting the CCP aggravator is the same premeditation underlying the murder conviction, raised to a higher level.
In my view, the murder of Charles Shaw does not meet the definition of CCP because it arose from a separate premeditated intent fueled by the defendant's failed attempt to either reconcile with or kill Lissa Shaw, rather than the heightened premeditation that would have supported CCP had Diaz succeeded in killing Lissa. Precedent in which we have approved a CCP finding based on transferred intent is consistent with this view.
In Provenzano v. State, 497 So.2d 1177 (Fla.1986), the defendant killed a bailiff in a shooting spree when another bailiff attempted to stop Provenzano from reaching into his pocket for a weapon he had brought into a courtroom to effectuate his plan to kill the officers who had arrested him. This Court recognized that the facts did not fit the usual scenario for transferred intent, such as "when a defendant aims and shoots at A intending to kill him but instead misses and kills B." Id. at 1180. However, we held that the transferred intent doctrine supported the firstdegree murder conviction because the premeditated design to kill the two officers "directly resulted in the death of another human being." Id. at 1181. In approving the finding of CCP based on the same evidence, we stated:
Heightened premeditation necessary for this circumstance does not have to be directed toward the specific victim. Rather, as the statute indicates, if the murder was committed in a manner that was cold and calculated, the aggravating circumstance of heightened premeditation is applicable. (Emphasis supplied.) The facts herein indicate that the manner in which Provenzano effectuated his design of death was cold, calculated and *974 premeditated beyond a reasonable doubt.
Id. at 1183. In contrast, in this case the murder of Charles Shaw resulted indirectly from the premeditated design to kill Lissa, and was not committed in a calculated manner.
Other cases in which we have approved a CCP finding are similarly distinguishable in that they involved a single act or course of conduct directly harming an unintended victim. In Sweet v. State, 624 So.2d 1138, 1142 (Fla.1993), the defendant shot and wounded Cofer, his intended victim, and killed a neighbor while both were trying to escape an apartment Sweet was attempting to enter. This Court rejected Sweet's challenge to the CCP aggravator on grounds that the person he killed was not the subject of his planning, and stated: "Sweet was probably surprised by the presence of Cofer's neighbors, and planning is not the equivalent of shooting skill." Id. at 1142. In Howell v. State, 707 So.2d 674 (Fla.1998), this Court approved a CCP finding on evidence showing that a bomb contained in a microwave oven, which was intended for a different victim, killed a Florida Highway Patrol trooper during a roadside investigation. Finally, Bell v. State, 699 So.2d 674 (Fla. 1997), involved a retribution killing of the wrong person in a case of mistaken identity.
Unlike these cases, the original murderous intent in this case did not directly result in the death of another human being. As reflected in the majority opinion, after Diaz and Charles Shaw confronted one another in the yard and garage, Diaz chased Charles into the master bedroom, pointed the gun at him and pulled the trigger, reloaded the gun after it did not fire, followed Charles into the bathroom, shot him three times, and then, after pausing thirty seconds to a minute, shot him twice more, including once in the head. See majority op. at 964. These facts demonstrate a premeditated intent that was separate from the failed attempt to kill Lissa Shaw, and that did not reach the level of heightened premeditation. Nor, contrary to the conclusion in the majority opinion, was the killing committed in a manner that can be deemed calculated.[11] By his own statement to the victim's wife at the time of the murder, Diaz decided to kill Charles Shaw only because his attempt to murder Shaw's daughter failed. See majority op. at 964. While Diaz may have calculated the murder of Lissa, there is no evidence that he calculated the murder of Charles. Cf. Amoros v. State, 531 So.2d 1256, 1261 (Fla.1988) (finding insufficient evidence that the defendant's plan to kill his former girlfriend encompassed her housemate).
Consistent with our precedent, the CCP finding should comport with the purpose of the transferred intent rule: "to hold a defendant criminally liable to the full extent of his or her criminal culpability." State v. Fekete, 120 N.M. 290, 901 P.2d 708, 714 (N.M.1995). However, in this case the CCP determination holds Diaz fully responsible in his killing of Charles for his heightened premeditation in the attempted murder of Lissa, beyond the full extent of his criminal culpability. As stated in Mordica v. State, 618 So.2d 301, 304 (Fla. 1st DCA 1993), "[t]he doctrine of *975 transferred intent, by definition, operates to transfer the defendant's intent as to the intended victim to the unintended victim, and nothing more." In this case, intent transfers as to the aggravator but not as to the element of premeditation supporting the conviction of first-degree murder. In my view, Diaz's conviction for the murder of Charles rests on legally sufficient evidence of premeditation in the confrontation between the two men after Lissa left the scene, whereas the heightened premeditation necessary to establish CCP requires reliance on evidence of a premeditated design to kill Lissa, which culminated in her attempted murder. In approving, for purposes of sentence aggravation, the transfer of an intent that was unnecessary to prove the underlying crime, the majority employs the transferred intent doctrine in a manner inconsistent with its purpose. Therefore, I would strike the CCP aggravator.
Invalidation of the HAC and CCP aggravating factors in this case leaves only the single aggravating factor of a prior violent felony conviction, resting on the attempted murder of Lissa and the burglary of the Shaws' home. In light of the substantial mitigation found by the trial court, I cannot conclude that the death penalty is proportionate to other singleaggravator cases in which we have affirmed sentences of death. As a general rule, this Court affirms death sentences based on a single aggravator either where there is little or nothing in mitigation, or where a prior murder was involved. See Almeida v. State, 748 So.2d 922, 933 (Fla. 1999); Jones v. State, 705 So.2d 1364, 1366 (Fla.1998). Diaz was not previously involved in a murder, and the trial court found six mitigators, including three statutory mitigators, and gave three mitigators "moderate weight," including the mitigator of commission of the capital crime under the influence of extreme mental or emotional disturbance. I would reduce Diaz's sentence to life imprisonment.
ANSTEAD, C.J., and SHAW, Senior Justice, concur.
NOTES
[1] At some point during the incident, a neighbor walked up to the Shaws' house. When he approached, both the garage door and the door leading from the garage to the inside of the house were open. The man saw an individual pacing back and forth inside the home, and as he entered the garage, he called out for Charles. Diaz then stepped into the garage, pointed the gun at the man, and said, "Get the f___ out of here." The neighbor returned to his house and called police.
[2] Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] The aggravating factors were: (1) the capital felony was especially heinous, atrocious, or cruel (HAC) (great weight); (2) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (great weight); and (3) the defendant was previously convicted of another capital felony or of a felony involving use or threat of violence to the person (great weight).
[4] The mitigating factors were: (1) the defendant had no significant history of prior criminal activity (very little weight); (2) the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance (moderate weight); (3) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (very little weight); (4) the age of the defendant at the time of the crime (moderate weight); and (5) the existence of any other factors in the defendant's background that would mitigate against imposition of the death penalty: (a) the defendant was remorseful (very little weight); and (b) the defendant's family history of violence (moderate weight).
[5] Diaz also argues that circumstantial evidence corroborates his testimony that he lost control after Charles Shaw struck him in the face in the garage. However, because Diaz's claim is essentially that this circumstantial evidence negates a finding of the heinous, atrocious, or cruel (HAC) and cold, calculated, and premeditated (CCP) aggravating factors and therefore affects the proportionality of his death sentence, we address this claim in the remaining issues. Also, as explained below, we note that whether an altercation in the garage furnishes circumstantial evidence that the victim struck Diaz in the face is ultimately irrelevant given the substantial evidence surrounding Diaz's intent to go to the Shaw's house on the morning of October 28 to commit murder.
[6] We reject Diaz's claim that the trial court erred in instructing the jury on this aggravator. A court may give a requested jury instruction on an aggravating circumstance if the evidence adduced at trial is legally sufficient to support a finding of that circumstance. Ford v. State, 802 So.2d 1121, 1133 (Fla.2001), cert. denied, 535 U.S. 1103, 122 S.Ct. 2308, 152 L.Ed.2d 1063 (2002). Instead, we review whether substantial competent evidence supports this finding.
[7] Perhaps because of our practice of using the acronym "HAC" for this aggravator, we have not consistently recognized that the capital felony must be "especially" heinous, atrocious, or cruel, as section 921.141(5)(h) explicitly provides. See, e.g., Bowles v. State, 804 So.2d 1173, 1176 (Fla.2001) (discussing aggravator but not mentioning the word "especially"), cert. denied, 536 U.S. 930, 122 S.Ct. 2603, 153 L.Ed.2d 790 (2002); Rogers v. State, 783 So.2d 980, 994 (Fla.2001) (same). "Especially" or "especial" is defined as "of special note or importance, unusually great or significant." Webster's Collegiate Dictionary 396 (10th ed.1994). A more proper acronym for this aggravator may be "EHAC."
[8] We reject Diaz's claim that the trial court erred in instructing the jury on this factor. As noted above, a trial court may give a requested jury instruction on an aggravating circumstance if the evidence adduced at trial is legally sufficient to support a finding of that circumstance. Ford, 802 So.2d at 1133. Instead, we review whether substantial competent evidence supports this finding.
[9] We note that "this Court has never approved a `domestic dispute' exception to the imposition of the death penalty." Spencer v. State, 691 So.2d 1062, 1065 (Fla.1996).
[10] One of the remaining aggravators, prior violent felony convictions, carries less weight when, as in this case, it is not based on a significant history of violent crimes. See Hess v. State, 794 So.2d 1249, 1266 (Fla.2001).
[11] I note that the statement in Provenzano, "if the murder was committed in a manner that was cold and calculated, the aggravating circumstance of heightened premeditation is applicable," is inconsistent with section 921.141(5)(i), which provides that CCP applies if the murder "was committed in a cold, calculated, and premeditated manner." (Emphasis supplied.) Under the statute, heightened premeditation must exist independently of whether the murder was committed in a cold and calculated manner.