PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm Brown’s first-degree murder conviction and death sentence.
I. BACKGROUND
On August 20, 2009, Thomas Brown was indicted for the first-degree murder of Juanese Miller. Brown was also charged with one count of possession of a firearm by a convicted felon, which was later severed from the murder charge.
A. Guilt Phase
Ms. Miller and Brown were both coworkers at a Wendy’s restaurant in Jacksonville, Florida. It is clear that they did not get along with each other. On Sunday, June 14, 2009, Ms. Miller poured ice and salt down Brown’s back. Brown, who was twenty-seven years old at the time, became visibly upset and told Ms. Miller that he did not want her to bother him. The following day (Monday), Brown and Ms. Miller were both present at a meeting held at the restaurant. At or around the time of the meeting, Ms. Miller called Brown a “p*ssy n*gger,” which offended Brown. Angelette Harley, who was both Brown’s girlfriend and a Wendy’s manager, testified that she thought Ms. Miller and Brown were both “written up.” Brown and Ms. Miller’s work hours were “cut.” Brown, who was upset, wondered why he was in trouble.
Mike Emami, the Wendy’s franchisee, testified that it was brought to his attention that there was a conflict between Brown and Ms. Miller. Emami said he discussed the issue with Brown in a fairly calm manner. Emami maintained that no one was reprimanded for the ice incident. Emami was told that everything was okay between Brown and Ms. Miller. While Ms. Miller and Brown did not work together on Tuesday and Wednesday, they both worked at Wendy’s on Thursday, the day Ms. Miller was killed.
On Thursday, Wendy’s employees testified that they did not notice any problems between Brown and Ms. Miller. At around 11:00 a.m., Brown made a telephone call to Ms. Harley, desiring to know why his work hours were “cut.” Emami testified that a manager informed him that Brown was upset regarding his work hours. According to Emami’s testimony, Brown could not keep up with the work demand and was consequently moved to perform a different task.
At approximately 12:15 p.m., Emami observed Brown working very slowly and looked unhappy. As a result, Emami pulled Brown to the back of the restaurant in order to talk with him.[1] Emami asked Brown what was wrong and questioned Brown about his attitude. Brown became “very, very upset.” Brown and Emami were first arguing inside an office and then proceeded to argue outside of the office. Brown asked why his hours were “cut”; Emami responded that Brown would need to discuss his hours with a manager, not Emami. Brown pointed his hand in Ema-mi’s face and said, “[Y]ou don’t Peking know me ... it ain’t going to be no more Wendy’s.” Brown was yelling and scream *214 ing. Emami and Brown were “fussing” loudly at each other in what was described as a “heated exchange.” Both men were mad and frustrated. An employee testified that Brown told Emami that “someone was going to kick his a* *.” Emami testified that he told Brown to leave Wendy’s at least five or six times and that if he did not leave, the police would be called; Ema-mi, in fact, did call 911. Brown casually walked out of Wendy’s and drove off in his vehicle. An employee testified that Ema-mi said “don’t come back,” however, Ema-mi denied making such statement. Emami also maintained that he never told Brown that he was fired.
Ms. Harley testified that she received a telephone call from Brown’s mother, which prompted Ms. Harley to “keep an eye out” for Brown. Ms. Harley arrived at Wendy’s at about 1:30 p.m. Shortly thereafter, Brown returned to the restaurant. While in the parking lot, Ms. Harley told Brown, who was still in his work uniform, that she wanted to talk to him. Brown declined and said, “[S]he [is] the reason why I don’t have my job.” Ms. Harley tried to stop Brown from going inside the restaurant. An employee of Wendy’s testified that Brown was upset, given his facial expressions. When Brown was inside the restaurant, he asked where Emami was; Emami was no longer there. Ms. Miller was ordering her lunch at the register, while standing on the customer-side of the counter. Ms. Harley testified that it appeared that Brown had no issue with Ms. Miller. Brown left the restaurant, got into his car, and put the car in reverse.
Brown then got out of his car. Ms. Harley again attempted to stop Brown from coming back inside Wendy’s. Brown pushed her aside and went back inside the restaurant. Ms. Miller, who had her back to the door, did not see Brown come inside. Brown proceeded to walk toward Ms. Miller. Brown, who was not trying to conceal his identity, reached under his shirt, into his waistband, and pulled out a .40 caliber Smith and Wesson semi-automatic firearm. From a range of two to three feet, Brown fired a shot at Ms. Miller. Brown then asked, “[Wjhere the Pck Mike [Emami] at[?]” Brown fired more shots at Ms. Miller. Brown then walked toward the door and pushed the door open a little. Brown turned around and walked back to Ms. Miller, who was lying on the floor. Brown stood over Ms. Miller, and angrily said, “I told you I would kill you, you Peking b*tch.” Brown fired his final shot at Ms. Miller. Before leaving Wendy’s and driving off, Brown said, “Now, you can go and tell Mike, tell Mike thanks.” There were about ten customers inside of the restaurant at the time of the shooting. In describing Brown, witnesses testified that he snapped, was agitated, angry, focused, pissed-off, and had a mad and blank look on his face.
The next day (Friday), Brown was taken into custody after law enforcement located his vehicle at a Jacksonville hotel. A .40 caliber Smith and Wesson semi-automatic firearm was discovered on a dresser inside of the hotel room where Brown was apprehended. Testimony established that four shell casings recovered from the crime scene were fired from the Smith and Wesson pistol. A notebook was discovered inside Brown’s vehicle. In the notebook, there was a passage titled “My life!!!” which stated, in pertinent part:
I’ve lost the only two jobs I’ve had in my life for no reason at all, but do people care? No!! The only time people in this world care, is when a person is a threat ... I just offed a B*tch cause she was the cause of my life being Pcked up, this time. If she ain’t dead, then she will learn how serous [sic] words can be. I *215 wanted “Mike the owner” to be there, but I guess it ain’t his time yet.
The medical examiner testified that Ms. Miller received injuries to her arm, back, neck, lungs, trachea, aorta, rib, kidneys, and abdomen. The medical examiner found that Ms. Miller was also shot in the back of her head, but was unable to determine whether the head wound was inflicted as the final injury. The medical examiner opined that Ms. Miller bled to death, suffering from multiple organ and vascular perforations with hemorrhage.
After the State rested, Brown moved for a judgment of acquittal, claiming that there was no evidence of premeditation. The trial judge denied the motion. The defense did not present a case. Brown then renewed his motion for judgment of acquittal, which the trial court again denied.[2] The jury, which was instructed on only first-degree premeditated murder, convicted Brown of first-degree murder.
B. Penalty Phase and Sentencing
The parties stipulated that Brown was convicted of robbery in Georgia in 1999, which occurred when Brown was seventeen years old. A victim of that robbery testified that Brown placed a gun to her head and demanded that she open the gas station’s cash register. The State also presented evidence that Brown was paroled in Georgia in April 2008 and the State of Florida thereafter accepted Brown’s supervision. The jury also heard that Ms. Miller was murdered at twenty-two years old and was survived by her three-year-old child.
The lay witnesses presented by the defense showed that Brown’s parents split up when Brown was about two and a half years old and that Brown had very little guidance from adults. Moreover, Brown and his siblings were left alone, had no structure, and lived in distress. Further, testimony was offered to establish that Brown’s mother did not show the kind of love that a mother should, she did not have time for her children, and she was not stable.
Dr. Harry Krop, a psychologist, also testified for the defense. Dr. Krop stated that Brown’s family was dysfunctional, and that Brown’s mother, who constantly belittled Brown, was a major contributor to his lack of emotional development. Since age six or seven years old, Brown has been in therapy. Brown was diagnosed with bipolar disorder, manic with psychotic features, psychotic disorder not otherwise specified, dysthymia, attention deficit hyperactivity disorder, oppositional defiant disorder, and antisocial personality disorder. Dr. Krop testified that Brown is an extremely immature individual, who had trouble learning. Additionally, Brown had paranoid distrust, blamed others for his mistakes and shortcomings, had an air of pseudo-confidence, and a history of poor impulse control and adjustment difficulties. Brown reported hearing voices and was prescribed antipsy-chotic medication and antidepressant medication.
Dr. Krop found that Brown “probably” has mild neuropsychological impairment. Dr. Krop believed that the mistrust, suspicion, and paranoia, had a significant impact on Brown’s perception of reality at the time of the murder. Brown’s behavior at the time of the murder was a reflection of his long history of perceiving that people were trying to wrong him in some way, according to Dr. Krop. Dr. Krop opined that Brown had a serious emotional disorder at the time of the murder which im *216 pacted his judgment and led to the murder. Because of an emotional overlay and the possibility that he was not putting forth maximum effort during the testing, Dr. Krop was unable to conclude whether Brown had organic brain damage. According to Dr. Krop, Brown would have been capable of conforming his conduct to the requirements of the law and knew the criminality of his conduct. Dr. Krop tested Brown’s IQ and ascertained a full scale IQ of 67. Notwithstanding this IQ score, Dr. Krop was unable to formally diagnose Brown as mentally retarded due to mixed factors causing lower results at the time of the testing. Dr. Krop opined that Brown’s mental age was significantly lower than his chronological age.
Ms. Harley testified that prior to the shooting, Brown was “blank,” “like he didn’t see nothing,” and “cold.” According to Ms. Harley, Brown snapped because “it wasn’t him.”
The State offered psychologist Dr. William Riebsame in rebuttal, who opined that he did not believe that Brown was experiencing any kind of psychotic symptoms at the time of the murder. Dr. Riebsame testified that Brown’s mental health history was not steering his decision-making and behavior at the time of the murder. Dr. Riebsame opined that Brown was exaggerating psychiatric problems and malingering the psychoses, and that he exaggerated and malingered his emotional and behavioral problems so that he could sidestep responsibility.[3]
The jury recommended the death penalty by a vote of seven to five.[4] The sentencing judge found the following three statutory aggravators, assigning each of them “great weight”: (1) Brown was previously convicted of a felony involving the use of violence to the person, § 921.141(5)(b), Fla. Stat. (2011); (2) Brown was previously convicted of a felony and under a sentence of imprisonment or placed on community control or on felony probation when he committed the murder, § 921.141(5)(a), Fla. Stat. (2011); and (3) the murder was committed in a cold, calculated, and premeditated manner and without any pretense of moral or legal justification (CCP), § 921.141(5)(i), Fla. Stat. (2011).[5] State v. Broion, Case No. 09-8160-CF (Fla. 4th Cir.Ct. Oct. 28, 2011) (Sentencing Order, at 6-12).
As to mitigation, the sentencing court found two statutory mitigators: (1) Brown was under the influence of extreme mental or emotional disturbance at the time he committed the murder, § 921.141(6)(b), Fla. Stat. (2011), and gave it “some weight”; and (2) Brown’s age at the time of the murder (twenty-seven), § 921.141(6)(g), Fla. Stat. (2011), and assigned it “slight weight.” Sentencing Order, at 17-18. The sentencing judge also found five nonstatutory mitigating circumstances.[6] After considering and weighing *217 the aggravating and mitigating factors and the jury’s recommendation in the case (which it gave “great weight”), the trial court concluded that death was the appropriate penalty. Id. at 24.
II. ANALYSIS
On appeal from his first-degree murder conviction and sentence of death, Brown raises the following claims: (1) whether the trial court erred in finding the CCP aggravator; (2) whether Brown’s death sentence is a proportionately unwarranted sentence; (3) whether the penalty-phase jury instructions violated Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (4) whether Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires the reversal of Brown’s death sentence; and (5) whether the trial court erred in refusing to permit Brown to present guilt-phase evidence of his mental condition at the time of the murder. In addition to addressing these issues, we also independently review the record to determine whether competent, substantial evidence supports the verdict.
A. The CCP Aggravator
Brown argues that the trial court erred in finding the CCP aggravator. Specifically, Brown asserts that the evidence does not support “cold” and “calculated,” [7] that the trial court did not consider all of the evidence, and that the trial court summarily dismissed its finding that Brown was under the influence of an extreme mental or emotional disturbance at the time of the murder as having no relevance to whether the CCP aggravator existed.
In evaluating claims of error in the application of aggravators, this Court’s function is “to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.” Diaz v. State, 860 So.2d 960, 968 (Fla.2003) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)). “[Tjhis Court does not reweigh the evidence to determine whether the State proved each factor beyond a reasonable doubt.” Id. at 965.
We have previously articulated what is required for CCP:
To establish CCP, the evidence must show “that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), ... that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), ... that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification.”
Diaz, 860 So.2d at 968 (quoting Jackson v. State, 648 So.2d 85, 89 (Fla.1994)). The CCP aggravator can “be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.” Franklin v. State, 965 So.2d 79, 98 (Fla.2007) (quoting Swafford v. State, 533 So.2d 270, 277 (Fla.1988)); see also Hall v. State, 107 So.3d 262, 278 (Fla.2012) (“[Tjhis Court has held that where a defendant arms himself in advance, kills exe *218 cution-style, and has time to coldly and calmly decide to kill, the element of ‘calculated’ is supported.”), petition for cert. filed, No. 12-10952 (U.S. June 20, 2013). We find that the trial court applied, in its sentencing order, the correct rule of law as to the CCP aggravator.
In reviewing the circumstances of this murder, Brown returned to Wendy’s about forty-five minutes to an hour after his argument with Emami. Brown pushed Ms. Harley aside before entering the restaurant looking for Emami, who was no longer there. Brown then exited Wendy’s, got inside his car, and put the car in reverse. Subsequently, Brown got out of his car and went back inside Wendy’s after Ms. Harley again unsuccessfully tried to stop Brown from entering. While inside the restaurant, Brown retrieved a gun from his waistband. Ms. Miller, who had her back to the door, was shot three times by Brown. Brown walked toward the exit door, pushed the door open, but then stopped and walked back to Ms. Miller, who was lying on the floor. Brown stood over Ms. Miller and said with emphasis, “I told you I would kill you, you f* eking b*tch.” Brown then fired a fourth shot at Ms. Miller. One of the bullets went into the back of Ms. Miller’s head.[8] Several of Ms. Miller’s major organs were perforated due to the shooting. Before leaving, Brown said, “Now, you can go and tell Mike [Emami], tell Mike thanks.” In a passage composed the day of the murder or the next day before he was apprehended, Brown wrote that he “just offed a B*tch” and that he “wanted ‘Mike the owner’ to be there, but I guess it ain’t his time yet.”
We reject the notion that Brown was provoked by Ms. Miller at the time of the murder. The evidence establishes that on June 14, 2009, Ms. Miller poured ice and salt down Brown’s back at Wendy’s. On June 15, Brown was offended at the restaurant when Ms. Miller called him a “p*ssy n*gger.” Brown and Ms. Miller did not work together on June 16 or June 17. As to June 18 — the day of the murder — the record is devoid of any evidence suggesting that Ms. Miller took any action directed at Brown or uttered any offensive words toward him. Thus, we find a complete lack of resistance, struggle, or provocation by Ms. Miller, who by all accounts did not even know that Brown was approaching her as she had her back to the door before she was murdered.
In addition to the lack of resistance or provocation on the part of Ms. Miller, Brown procured a weapon in advance. See Buzia v. State, 926 So.2d 1203, 1215 (Fla.2006) (“We have found the CCP aggravator where the defendant procured a weapon beforehand.”). Moreover, from a close range, Brown shot Ms. Miller four times, including an execution-style shot in the back of her head.[9] See Ford v. State, 802 So.2d 1121, 1133 (Fla.2001) (finding that the defendant “shot the victims ‘execution-style,’ i.e., he shot [one victim] in the back of the head and [the other] through the roof of her mouth”). Ms. Harley testified that Brown was “cold” at the time of the murder. The record indicates that Brown *219 carried out the killing as a matter of course.
Brown clearly had ample time to reflect on the proposed murder and abandon the plan. This murder can be described as “the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage.” See Diaz, 860 So.2d at 968 (quoting Jackson, 648 So.2d at 89). “A plan to kill may be demonstrated by the defendant’s actions and the circumstances surrounding the murder even when there is evidence that the final decision to kill was not made until shortly before the murder itself.” Baker v. State, 71 So.3d 802, 819 (Fla.2011). We find that Brown had a careful plan or prearranged design to commit murder prior to the murder taking place. Brown planned to kill Ms. Miller because “she was the cause of [his] life being f*cked up, this time.” Although Brown entered Wendy’s initially looking for Emami, the heightened premeditation necessary for the CCP aggravator “does not have to be directed toward the specific victim. Rather, as the statute indicates, if the murder was committed in a manner that was cold and calculated, the aggravating circumstance of heightened premeditation is applicable.” Diaz, 860 So.2d at 969 (quoting Provenzano v. State, 497 So.2d 1177, 1183 (Fla.1986)). The murder in the instant case has all of the hallmarks of the CCP aggravator: evidence of advance procurement of a weapon, the appearance of a killing carried out as a matter of course, and lack of resistance. See Franklin, 965 So.2d at 98; see also Swafford, 533 So.2d at 277. The elements “cold,” “calculated,” and “premeditated” were established and Brown does not claim to have a pretense of moral or legal justification. Accordingly, there is competent, substantial evidence supporting the trial court’s finding of CCP.[10]
B. Proportionality Review
Brown claims that his death sentence is a proportionately unwarranted sentence. “Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review.” Hurst v. State, 819 So.2d 689, 700 (Fla.2002). In performing this review:
“[W]e make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” We consider the totality of the circumstances of the case and compare the case to other capital cases. This entails “a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.” In other words, proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.”
Williams v. State, 37 So.3d 187, 205 (Fla.2010) (quoting Offord v. State, 959 So.2d 187, 191 (Fla.2007)).
In this case, the jury recommended the death penalty by a vote of seven to five. The trial court, in its sentencing order, found the following three statutory aggra-vators and assigned “great weight” to each of them: (1) Brown was previously convicted of a felony involving the use of violence to the person; (2) Brown was previously convicted of a felony and under a sentence of imprisonment or placed on community control or on felony probation when he committed the murder; and (3) CCP. Two of the aggravators found — prior violent fel *220 ony and CCP — are among the weightiest in Florida’s statutory sentencing scheme. See Anderson v. State, 18 So.3d 501, 510 (Fla.2009) (“We have said that CCP and prior violent felony ‘are among the weightiest of aggravators.’ ” (quoting Deparvine v. State, 995 So.2d 351, 381 (Fla.2008))).
The trial court found two statutory miti-gators: (1) Brown was under the influence of extreme mental or emotional disturbance at the time he committed the murder (some weight); and (2) Brown’s age (twenty-seven) at the time of the murder (slight weight). Additionally, the trial court found five nonstatutory mitigating circumstances: (1) Brown experienced a difficult childhood, including, but not limited to, a lack of parental guidance as a child (some weight); (2) Brown has a borderline retarded IQ (some weight); (3) Brown offered to plead guilty to a sentence of life in prison (little weight); (4) Brown suffers from mental illness (some weight); and (5) the victim did not suffer (little weight).
This Court has upheld a sentence of death in cases which presented aggravation similar to that presented in Brown’s case. See Diaz, 860 So.2d at 970-71 (finding death sentence proportionate based on CCP and prior violent felony, which included the following mitigators: no significant history of prior criminal activity; extreme mental or emotional disturbance; the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; the age of the defendant; the defendant was remorseful; and the defendant’s family history of violence); see also Gunsby v. State, 574 So.2d 1085, 1088 (Fla.1991) (finding the defendant’s sentence of death proportionate given CCP, prior violent felony, and under sentence of imprisonment aggravators; and one nonstatutory mitigating factor: defendant is mildly retarded and intellectually functions on a third or fourth-grade level).
In arguing that his death sentence is disproportionate, Brown relies on Robertson v. State, 699 So.2d 1343 (Fla.1997), receded from on other grounds by Delgado v. State, 776 So.2d 233 (Fla.2000), and Farinas v. State, 569 So.2d 425 (Fla.1990). However, unlike in the instant case, Robertson involved an unplanned murder, 699 So.2d at 1349, and is less aggravated (HAC and murder committed during the course of a burglary), id. at 1345, than the case at hand. Moreover, the mitigation in this case does not rise to the level of the “substantial” mitigation we found in Robertson. Id. at 1347.
The case at bar is more aggravated than that of Farinas with two aggravators, HAC and murder committed while engaged in a kidnapping. Farinas, 569 So.2d at 427-28, 431. Brown had a prior violent felony, while Farinas did not. Although the trial court below found that Brown has a borderline retarded IQ and suffers from mental illness, the murder was not a result of a “heated, domestic confrontation,” like that in Faunas. Id. at 431. We conclude that Brown’s reliance on Robertson and Faunas is misplaced.[11]
Taking into consideration the totality of the circumstances, we find that when compared to other decisions of this Court, Brown’s death sentence is proportionate.
C. Remaining Claims
We reject Brown’s contention that the penalty-phase jury instructions used in this case violate Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d *221 231 (1985).[12] See Patrick v. State, 104 So.3d 1046, 1064 (Fla.2012) (“ ‘[T]he standard penalty phase jury instructions fully advise the jury of the importance of its role, correctly state the law, do not denigrate the role of the jury and do not violate Caldwell....’” (quoting Jones v. State, 998 So.2d 573, 590 (Fla.2008) (citations omitted))), petition for cert, filed, No. 12-10148 (U.S. May 1, 2013). We also reject Brown’s assertion that Ring requires a reversal of his death sentence. The trial court found, as aggravation, that Brown was previously convicted of a felony involving the use of violence to the person and that he was under a sentence of imprisonment or placed on community control or on felony probation when he committed the murder. See Hodges v. State, 55 So.3d 515, 540 (Fla.2010) (“This Court has repeatedly held that Ring does not apply to cases where the prior violent felony, the prior capital felony, or the under-sentence-of-imprisonment aggravating factor is applicable.”). Finally, we reject Brown’s assertion that the trial court erred in refusing to allow him to present guilt-phase evidence of his mental condition at the time of the murder. See Chestnut v. State, 538 So.2d 820, 820 (Fla.1989).
D. Sufficiency of the Evidence
Although Brown does not challenge the sufficiency of the evidence supporting the verdict, this Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed.[13] See Blake v. State, 972 So.2d 839, 850 (Fla.2007). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Bradley v. State, 787 So.2d 732, 738 (Fla.2001).
We have defined “premeditation” as
more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
Id. (quoting Woods v. State, 733 So.2d 980, 985 (Fla.1999)). Premeditation may be inferred from such facts as “the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.” Id. (quoting Norton v. State, 709 So.2d 87, 92 (Fla.1997)).
In this case, we find that the evidence was sufficient to support a finding of premeditation by Brown. We note that before he fired his final shot, Brown walked to the exit door, but then returned to stand over Ms. Miller’s body and stated, “I told you I would kill you, you Peking b*tch.” In addition, one of the four bullets went into the back of Ms. Miller’s head and several of Ms. Miller’s major organs were perforated. We hold that competent, substantial evidence supports the jury’s finding of first-degree premeditated murder beyond a reasonable doubt.
III. CONCLUSION
In light of the foregoing, we affirm Brown’s conviction for first-degree murder and his sentence of death.
It is so ordered.
*222 POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, concur.

. An employee testified that Emami asked Brown to "punch out” for the day due to business being slow.

. During closing arguments, Brown’s defense counsel asked the jury to find Brown guilty of second-degree murder.

. Dr. Riebsame opined that Brown was not mentally retarded.

. At the hearing conducted pursuant to Spencer v. State, 615 So.2d 688 (Fla.1993), the defense presented the following evidence: (1) that Brown offered to plead guilty to first-degree murder for life in prison with credit for time served and possession of a firearm by a convicted felon shortly before trial commenced; and (2) sixteen different providers' medical records containing Brown's mental health records prior to his arrest.

. Brown's defense counsel had moved for a directed verdict on the CCP aggravator, which was denied by the trial court.

. The nonstatutory mitigation found by the trial court were as follows: (1) Brown experienced a difficult childhood, including, but not limited to, a lack of parental guidance as a child (some weight); (2) Brown has a borderline retarded IQ (some weight); (3) Brown offered to plead guilty to a sentence of life in prison (little weight); (4) Brown suffers from mental illness (some weight); and (5) the vie- *217 tim did not suffer (little weight). Sentencing Order, at 18-22, 24.

. Brown concedes on appeal that the State provided sufficient evidence to support the trial court's finding that Brown had heightened premeditation when he committed the murder.

. The medical examiner was unable to determine whether the head wound was inflicted as the final injury. We therefore disagree with the trial court’s finding that the shot that went into the back of Ms. Miller’s head was the final shot. Sentencing Order, at 11. This improper finding, however, does not affect our ultimate conclusion that there is competent, substantial evidence supporting the trial court's finding of CCP.

. One Wendy's employee testified that Brown shot Ms. Miller from a range of two to three feet, while another employee testified that Brown was three to four inches behind Ms. Miller.

. We reject Brown’s remaining assertions relating to the CCP aggravator.

. Brown's reliance on Ross v. State, 474 So.2d 1170 (Fla.1985), Douglas v. State, 575 So.2d 165 (Fla.1991), and White v. State, 616 So.2d 21 (Fla.1993), is also misplaced. We note that Ross, Douglas, and White each involve one statutory aggravator.

. Contrary to Brown’s assertion, the trial judge, in this case, informed the jury that its recommendation must be given "great weight” by the sentencing judge.

. As noted above, in his motion for a judgment of acquittal, Brown claimed that the State presented no evidence of premeditation.