# Supreme Court of Florida

————————

No. SC17-1538
————————

**THOMAS THEO BROWN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

September 13, 2018

PER CURIAM.

This case is before the Court on appeal from an order granting in part and denying in part a motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1), of the Florida Constitution. For the reasons that follow, we affirm the postconviction court's order.

# FACTS AND PROCEDURAL HISTORY

Appellant Thomas Theo Brown was convicted of first-degree murder for the shooting death of Juanese Miller. This Court described the facts of the case as follows:

> Ms. Miller and Brown were both co-workers at a Wendy's restaurant in Jacksonville, Florida. It is clear that they did not get along with each other. On Sunday, June 14, 2009, Ms. Miller poured ice and salt down Brown's back. Brown, who was twenty-seven years old at the time, became visibly upset and told Ms. Miller that he did not want her to bother him. The following day (Monday), Brown and Ms. Miller were both present at a meeting held at the restaurant. At or around the time of the meeting, Ms. Miller called Brown a "p*ssy n*gger," which offended Brown. Angelette Harley, who was both Brown's girlfriend and a Wendy's manager, testified that she thought Ms. Miller and Brown were both "written up." Brown and Ms. Miller's work hours were "cut." Brown, who was upset, wondered why he was in trouble.

> Mike Emami, the Wendy's franchisee, testified that it was brought to his attention that there was a conflict between Brown and Ms. Miller. Emami said he discussed the issue with Brown in a fairly calm manner. Emami maintained that no one was reprimanded for the ice incident. Emami was told that everything was okay between Brown and Ms. Miller. While Ms. Miller and Brown did not work together on Tuesday and Wednesday, they both worked at Wendy's on Thursday, the day Ms. Miller was killed.

> On Thursday, Wendy's employees testified that they did not notice any problems between Brown and Ms. Miller. At around 11:00 a.m., Brown made a telephone call to Ms. Harley, desiring to know why his work hours were "cut." Emami testified that a manager informed him that Brown was upset regarding his work hours. According to Emami's testimony, Brown could not keep up with the work demand and was consequently moved to perform a different task.

At approximately 12:15 p.m., Emami observed Brown working very slowly and looked unhappy. As a result, Emami pulled Brown to the back of the restaurant in order to talk with him. Emami asked Brown what was wrong and questioned Brown about his attitude. Brown became "very, very upset." Brown and Emami were first arguing inside an office and then proceeded to argue outside of the office. Brown asked why his hours were "cut"; Emami responded that Brown would need to discuss his hours with a manager, not Emami. Brown pointed his hand in Emami's face and said, "[Y]ou don't f*cking know me . . . it ain't going to be no more Wendy's." Brown was yelling and screaming. Emami and Brown were "fussing" loudly at each other in what was described as a "heated exchange." Both men were mad and frustrated. An employee testified that Brown told Emami that "someone was going to kick his a* *." Emami testified that he told Brown to leave Wendy's at least five or six times and that if he did not leave, the police would be called; Emami, in fact, did call 911. Brown casually walked out of Wendy's and drove off in his vehicle. An employee testified that Emami said "don't come back," however, Emami denied making such statement. Emami also maintained that he never told Brown that he was fired.

Ms. Harley testified that she received a telephone call from Brown's mother, which prompted Ms. Harley to "keep an eye out" for Brown. Ms. Harley arrived at Wendy's at about 1:30 p.m. Shortly thereafter, Brown returned to the restaurant. While in the parking lot, Ms. Harley told Brown, who was still in his work uniform, that she wanted to talk to him. Brown declined and said, "[S]he [is] the reason why I don't have my job." Ms. Harley tried to stop Brown from going inside the restaurant. An employee of Wendy's testified that Brown was upset, given his facial expressions. When Brown was inside the restaurant, he asked where Emami was; Emami was no longer there. Ms. Miller was ordering her lunch at the register, while standing on the customer-side of the counter. Ms. Harley testified that it appeared that Brown had no issue with Ms. Miller. Brown left the restaurant, got into his car, and put the car in reverse.

Brown then got out of his car. Ms. Harley again attempted to stop Brown from coming back inside Wendy's. Brown pushed her aside and went back inside the restaurant. Ms. Miller, who had her back to the door, did not see Brown come inside. Brown proceeded to

walk toward Ms. Miller. Brown, who was not trying to conceal his identity, reached under his shirt, into his waistband, and pulled out a .40 caliber Smith and Wesson semi-automatic firearm. From a range of two to three feet, Brown fired a shot at Ms. Miller. Brown then asked, "[W]here the f*ck Mike [Emami] at[?]" Brown fired more shots at Ms. Miller. Brown then walked toward the door and pushed the door open a little. Brown turned around and walked back to Ms. Miller, who was lying on the floor. Brown stood over Ms. Miller, and angrily said, "I told you I would kill you, you f*cking b*tch." Brown fired his final shot at Ms. Miller. Before leaving Wendy's and driving off, Brown said, "Now, you can go and tell Mike, tell Mike thanks." There were about ten customers inside of the restaurant at the time of the shooting. In describing Brown, witnesses testified that he snapped, was agitated, angry, focused, pissed-off, and had a mad and blank look on his face.

The next day (Friday), Brown was taken into custody after law enforcement located his vehicle at a Jacksonville hotel. A .40 caliber Smith and Wesson semi-automatic firearm was discovered on a dresser inside of the hotel room where Brown was apprehended. Testimony established that four shell casings recovered from the crime scene were fired from the Smith and Wesson pistol. A notebook was discovered inside Brown's vehicle. In the notebook, there was a passage titled "My life!!!" which stated, in pertinent part:

> I've lost the only two jobs I've had in my life for no
> reason at all, but do people care? No!! The only time
> people in this world care, is when a person is a threat . . .
> I just offed a B*tch cause she was the cause of my life
> being f*cked up, this time. If she ain't dead, then she
> will learn how serous [sic] words can be. I wanted
> "Mike the owner" to be there, but I guess it ain't his time
> yet.

The medical examiner testified that Ms. Miller received injuries to her arm, back, neck, lungs, trachea, aorta, rib, kidneys, and abdomen. The medical examiner found that Ms. Miller was also shot in the back of her head, but was unable to determine whether the head wound was inflicted as the final injury. The medical examiner opined

that Ms. Miller bled to death, suffering from multiple organ and vascular perforations with hemorrhage.

After the State rested, Brown moved for a judgment of acquittal, claiming that there was no evidence of premeditation. The trial judge denied the motion. The defense did not present a case. Brown then renewed his motion for judgment of acquittal, which the trial court again denied. The jury, which was instructed on only first-degree premeditated murder, convicted Brown of first-degree murder.

*Brown v. State*, 126 So. 3d 211, 213-15 (Fla. 2013) (footnotes omitted).

After the penalty phase hearing, the jury recommended a sentence of death by a vote of seven to five. *Id.* at 216. After weighing and considering the aggravating[1] and mitigating[2] factors and the jury's recommendation, the court sentenced Brown to death on October 28, 2011. On direct appeal, Brown raised

---

1. In support of the death sentence, the judge found the following three statutory aggravators, assigning each of them "great weight": (1) Brown was previously convicted of a felony involving the use of violence to the person; (2) Brown was under a sentence of imprisonment or placed on community control or on felony probation when he committed the murder; and (3) the murder was committed in a cold, calculated, and premeditated (CCP) manner and without any pretense of moral or legal justification. *Id.* at 216.

2. The judge found two statutory mitigators: (1) Brown was under extreme mental or emotional disturbance at the time he committed the murder (given "some weight"); and (2) Brown's age (twenty-seven years old) at the time of the murder (given "slight weight"). *Id.* at 216. Additionally, the judge found the following five nonstatutory mitigating circumstances: (1) Brown experienced a difficult childhood that included but was not limited to a lack of parental guidance (given "some weight"); (2) Brown has a borderline retarded IQ (given "some weight"); (3) Brown offered to plead guilty to a sentence of life in prison (given "little" weight); (4) Brown suffers from mental illness (given "some weight"); and (5) the victim did not suffer (given "little weight"). *Id.* at 216 n.6.

five issues.[3]  This Court affirmed the conviction and death sentence.  *Id.* at 221.

On May 4, 2014, the Supreme Court denied certiorari review.  *Brown v. Florida*, 134 S. Ct. 2141 (2014).

On May 4, 2015, Brown filed his initial 3.851 motion for postconviction relief, raising sixteen claims.  Claims 3, 4, 5, 6 and 8 pertained to Brown's guilt phase, while claims 1, 2, 7, 9, 10, 11, 12, 13, 14, 15, and 16 pertained to Brown's penalty phase.  While Brown's motion was pending, the United States Supreme Court decided *Hurst v. Florida*, 136 S. Ct. 616 (2016).  On remand, this Court imposed the requirement that the findings necessary for imposing the death penalty must be found unanimously by the jury.  *Hurst v. State*, 202 So. 3d 40, 56 (Fla. 2016).  In light of this Court's decision in *Hurst*, the postconviction court granted claim 16—that the Supreme Court's decision in *Hurst v. Florida* invalidated Brown's sentence of death—and found that Brown was entitled to a new penalty phase.  As a result, collateral counsel withdrew claims 11, 12, 13, 14, and 15 and the postconviction court found claims 1, 2, 7, 9, and 10 moot.

---

3. Brown raised the following claims on direct appeal: (1) whether the trial court erred in finding the CCP aggravator; (2) whether Brown's death sentence is a proportionately unwarranted sentence; (3) whether the penalty-phase jury instructions violated *Caldwell v. Mississippi*, 472 U.S 320 (1985); (4) whether *Ring v. Arizona*, 536 U.S 584 (2002), requires the reversal of Brown's death sentence; and (5) whether the trial court erred in refusing to permit Brown to present guilt-phase evidence of his mental condition at the time of the murder. 126 So. 3d at 217.

Out of the remaining five claims related to Brown's guilt phase, collateral counsel withdrew claims 4 and 8, and the postconviction court held an evidentiary hearing on claims 3, 5, and 6, all of which were premised upon allegations of ineffective assistance of counsel. Following the evidentiary hearing, the postconviction court denied the claims. Now before this Court, Brown appeals the denial of claim 6: that trial counsel was ineffective for failing to object to an improper comment made during the State's closing argument.

## ANALYSIS

Appellant argues that the postconviction court erred in finding that trial counsel was not ineffective for failing to object and move for a mistrial during the State's closing argument. According to Appellant, he was prejudiced by trial counsel's failure to object because the State purported to quote words of Appellant that supported the State's argument that the murder was premeditated.

Following the United States Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a

- 7 -

> specific ruling on the performance component of the test when it is
> clear that the prejudice component is not satisfied.

*Maxwell v. Wainwright*, 490 So. 2d 927, 932 (Fla. 1986) (citations omitted).

Because both prongs of the *Strickland* test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo. *See Sochor v. State*, 883 So. 2d 766, 771-72 (Fla. 2004).

Generally, this Court's standard of review following the denial of a postconviction claim where the trial court has conducted an evidentiary hearing affords deference to the trial court's factual findings. *McLin v. State*, 827 So. 2d 948, 954 n.4 (Fla. 2002). "As long as the trial court's findings are supported by competent substantial evidence, 'this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.' " *Blanco v. State*, 702 So. 2d 1250, 1252 (Fla. 1997) (quoting *Demps v. State*, 462 So. 2d 1074, 1075 (Fla. 1984)).

Appellant claims that trial counsel was ineffective for not objecting when the State, during its closing argument, quoted Appellant as saying, "I told you I'd kill you, I had it in my mind to kill you, I've wanted to kill you for several days. I wanted to kill someone to take out my frustration." During the evidentiary

hearing, Appellant's trial counsel, Mr. Gazaleh, recalled the prosecutor's closing argument and the quote in contention. He testified that he considered objecting, but based upon the prosecutor's demeanor and tone he did not believe the prosecutor was attempting to quote Appellant. Instead, he believed the prosecutor was providing a general comment on the evidence presented at trial. This decision was based on his professional judgment and experience and falls within the wide range of professional assistance required by *Strickland*. Thus, Appellant fails to show that counsel's performance was deficient.

Furthermore, Appellant fails to show that he was prejudiced by trial counsel's decision not to object to the State's comment during closing argument. Appellant contends that the prosecutor's misstatement wrongfully informed the jury that he admitted to premeditated murder. However, as the postconviction court noted, the record provides ample evidence that Appellant's actions were premeditated. Specifically, "[n]umerous eyewitnesses testified at trial that [Appellant], upon learning that Mr. Emani was not at the restaurant, walked out to his car, attempted to leave, but again reentered Wendy's before shooting the victim four times." Then, after shooting Miller four times, Appellant said to the victim, "I told you I would kill you, you f*cking b*tch." Following the murder, Appellant wrote in his journal:

> I've lost the only two jobs I've had in my life for no reason at all, but do people care? No!! The only time people in this world care, is

when a person is a threat . . . I just offed a B*tch cause she was the cause of my life being f*cked up, this time. If she ain't dead, then she will learn how serous [sic] words can be. I wanted "Mike the owner" to be there, but I guess it ain't his time yet.

Appellant cannot show that but for the State's misquote, the jury would not have found him guilty of first-degree murder. Accordingly, the postconviction court properly denied this claim.

## CONCLUSION

For the foregoing reasons, we affirm the postconviction court's partial denial of postconviction relief.

It is so ordered.

CANADY, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, LABARGA, and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
    Elizabeth Senterfitt, Judge - Case No. 162009CF008160AXXXMA

Christopher J. Anderson, Neptune Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Christina Z. Pacheco, Assistant Attorney General, Tampa, Florida,

    for Appellee